STATE *ex rel.* KNOX, ATTY. GEN., *v.* BOARD OF SUP'RS OF GRENADA COUNTY.*

(In Banc.  Oct. 5, 1925.  Suggestion of Error Overruled Oct. 26, 1925.)

[105 So. 541.  No. 25037.]

1. COUNTIES. *"County" is subject at all times to legislative control, except where specific provision of Constitution governs.*

   Since the county is a subdivision of the state, created for administrative and other public purposes, and owes its creation to the state, it is subject at all times to legislative control, except where specific provisions of the Constitution govern.

2. CONSTITUTIONAL. *Delegation of legislative power to Senate and House of Representatives held to carry all legislative power not withheld by specific constitutional provisions.*

   By section 33 of the state Constitution of 1890, the legislative authority of the state is vested in the legislature composed of the Senate and House of Representatives; the delegation being in general terms, carries all of the legislative power not withheld by a specific provision of the Constitution.

3. CONSTITUTIONAL LAW. *Counties. Board of county supervisors held to have no jurisdiction except that conferred by Constitution, which legislature cannot change.*

   Under section 170 of the state Constitution of 1890, each county is divided into five districts, and a resident freeholder from each

district is chosen to constitute a board of supervisors, and such a board has full jurisdiction over roads, ferries, and bridges, to be exercised in accordance with regulations prescribed by the legislature, and other duties may be conferred by law. The board has no jurisdiction (except such as conferred by the Constitution) which the Legislature cannot change.

4. CONSTITUTIONAL LAW. *Court may not declare law invalid except when it is clearly in conflict with Constitution.*
   It is for the legislature to decide what laws are necessary and for the government of the state and of the counties, and it is not for the court to decide whether the law is needed or whether it is wise. It cannot declare a law passed by the legislature invalid, except when it is clearly in conflict with the Constitution.

5. OFFICER. *Statute making officer, neglecting or refusing to perform duties required thereby, subject to removal from office, held not in conflict with constitutional provision for removal of officers from office.*
   Chapter 325 of the Laws of 1924 is not void as being in conflict with section 175 of the Constitution of 1890, providing that officers may be removed upon conviction of crime in office on indictment by the grand jury, as section 6 of the said act does not prescribe the method of removal. The method prescribed by section 175 is to be construed as being the plan contemplated by the statute.

6. OFFICERS. *Statute providing for recovery of damages in suit by district attorney held not to conflict with constitutional provision that district attorneys shall have fixed salary.*
   Said chapter is not in conflict with section 174 of the Constitution of 1890, which provides for district attorneys "whose compensation shall be a fixed salary." The act does not confer upon the district attorney the right to collect fees.

7. CONSTITUTIONAL LAW. *Statute providing for supervision of public offices held not to violate constitutional prohibition against officers of one department of government exercising power of another department.*
   Chapter 325, Laws of 1924, is not in conflict with sections 1 and 2 of the Constitution of 1890, providing for the separate departments of government, and prohibiting the officers of one department from exercising the powers of another department.

8. TAXATION. *Statute providing for auditing and supervising public offices held not in conflict with constitutional requirement of equality and uniformity in taxation.*

Said chapter is not in conflict with section 112 of the Constitution of 1890, providing for equality and uniformity in taxation, as the act does not provide for taxation nor how the moneys for the payment of the amounts required to be paid by counties shall be raised by the counties. It is in no sense a taxation statute.

9. STATES. *Statute providing for supervision and auditing of offices held not appropriation bill.*

The said chapter is not an appropriation bill within the meaning of sections 63 and 69 of the state Constitution of 1890. It is an act creating an auditing system and providing for its operation, the expenses of which are provided from appropriations already made or funds already available to the several institutions and departments.

---

*Headnotes 1. Counties, 15 C. J., Sections 1, 4, 53; 2. Constitutional Law, 12 C. J., Section 167; 3. Constitutional Law, 12 C. J., Section 318; Counties, 15 C. J., Section 103; Ferries, 25 C. J., Sections 7, 46; 4. Constitutional Law, 12 C. J., Sections 222, 390; 5. Officers, 29 Cyc., p. 1406; 6. Officers, 29 Cyc., p. 1426; 7. Constitutional Law, 12 C. J., Section 401 (Anno); 8. Taxation, 37 Cyc., p. 729; 9. States, 36 Cyc., p. 892.

APPEAL from circuit court of Grenada county.

HON. T. L. LAMB, Judge.

Mandamus by the state, on the relation of Rush H. Knox, attorney-general, against the board of supervisors of Grenada county. From a judgment dismissing the petition, plaintiff appeals. Reversed and remanded.

*Harry M. Bryan,* Assistant Attorney-General, for the state.

I. *Mandamus is the proper remedy.* Section 170 of the Constitution prescribes the jurisdiction of boards of supervisors. Our supreme court, in *Monroe County* v. *Strong,* 78 Miss. 565, 29 So. 530, and *Jefferson County* v. *Grafton,* 74 Miss. 435, 21 So. 247, has held that county boards have no life, no attributes, no power, no rights, and no obligations, but such as have been conferred or

imposed on them. Therefore, if measured by the constitutional provision creating boards of supervisors, it cannot be successfully urged that such duties as prescribed by chapter 325 of the Laws of 1924 are unconstitutional because invading the judiciary. In other words, our contention is here that the act sought to· be performed is one over which the defendants have no discretion, but is for the performance of a duty imposed upon them by the legislature within its constiutional power. See also: 7 R. C. L. 927; 15 C. J. 581; *Jackson* v. *Neville,* 95 So. 626; *Miller, State Auditor,* v. *Russell,* 94 So. 706.

It was held at an early date in *Howe* v. *State,* 53 Miss. 57, that in auditing the reports of the county treasurer the board of supervisors acts in a ministerial and nonjudicial capacity. In this case it was held that they had no power to determine what commissions the treasurer should have.

In the leading case of *State* v. *Board of Commissioners of Edmunds County* (S. D.), 156 N. W. 96, the case of *Jones* v. *Board of Supervisors* (Miss.), 12 So. 341, was cited in support of this view. In the Jones case it was held that a claim for furniture purchased for a courtroom should have been audited by the court and ''certified to the board of supervisors, not for revision or correction or allowance, but that a warrant may be issued to the county treasurer.''

The legislature having the power to enforce a duty upon the board of supervisors not involving judicial discretion, the board's refusal to contribute as alleged in the petition, warranted the action of mandamus.

II. *The act creating the uniform auditing system is not unconstitutional as making an appropriation without fixing the maximum amount.* Chapter 325, Laws of 1924, is not an appropriation bill. The amounts to be collected by the chief inspector from the counties, institutions and officers, for the maintenance of the auditing bureau, are

required to be delivered by the chief inspector "to be placed to the credit of the state auditing department fund." The act requires that the chief inspector keep books showing the amounts credited to the institutions, boards of supervisors and officers.

It will be noted that the statute created a *state auditing department fund.* Similar to the above are the methods employed for checking funds out of the state treasury by the State Highway department, and by the superintendent of banks.

The fund received by the state treasury under this act is in the nature of a trust fund for a specific purpose and is not one that comes to it as the result of direct taxation, such as follows the levy of an *ad valorem* or excise tax.

III. *The act under review is not unconstitutional as depriving such officers of powers and prerogatives, nor of taking away personal liberty and property rights of the citizens of the State without due process of law.* In several grounds of the demurrer, appellees raised the question of the deprivation of local self-government. They urge that the act under which this proceeding was brought, is drastic and harsh in that it takes away personal liberty and property rights of the citizens of the state; that it deprives boards of supervisors of the right to cause an audit to be made of the books of the county officers unless done with the consent of, and by the direction of the chief inspector.

The great burden of appellee's song is that the act is unwise, inexpedient and is a reflection of a tendency that does not comport with good policy.

Our supreme court has, by a long line of cases, consistently held that the wisdom or policy of a statute is not within its jurisdiction, nor can the courts determine such things as belong particularly to the legislative branch of the government. *Bobo* v. *Levee Commissioners,* 92 Miss. 792, 46 So. 819; *Hamner* v. *Yazoo Delta Lum-*

141 Miss.—45.

ber Co., 100 Miss. 349, 56 So. 466; *State* v. *Newman Lumber Company*, 102 Miss. 802, 59 So. 923; *State* v. *Henry*, 87 Miss. 125, 40 So. 152; *Daily* v. *Swope*, 47 Miss. 367; *Darnell* v. *Johnston*, 109 Miss. 570, 68 So. 780.

It was held in *Hart* v. *State*, 87 Miss. 171, 39 So. 523, that no statute would be condemned by the courts as unconstitutional unless in *palpable* conflict with some Constitutional provision, *and such a conflict will not be implied*.

Where there is a reasonable doubt of the Constitutionality of a statute, the court must uphold it. *Natchez, etc., R. Co.* v. *Crawford*, 99 Miss. 697, 55 So. 596. A corollary of the above is found in the case of *State* v. *L. & N. R. R. Co.*, 97 Miss. 35, 51 So. 918, 53 So. 454, in which it is held that where there are two constructions which may be placed upon a statute, the one which upholds it should be adopted by the court.

All legislative enactments carry with them the presumption of constitutionality, and it is incumbent upon those who attack them to clearly show the contrary. *Dantzler Lumber Co.* v. *State*, 97 Miss. 355, 53 So. 1; *Smith* v. *Eastman Gardner Lumber Co.*, 53 So. 7; *Beasley* v. *McElhaney*, 53 So. 8; *Richard* v. *City Lumber Co.*, 101 Miss. 678, 57 So. 977.

It is elementary that the courts will not pass on the constitutionality of a statute unless it is necessary to a determination of the issues. *Flora* v. *American Express Company*, 92 Miss. 66, 45 So. 149; *Power* v. *Ratcliff*, 72 So. 864. Therefore, in passing upon the demurrer before the court, the matter of expediency of this legislation should not be considered, and the sole question is whether or not the two hundred dollars required to be paid by the board of supervisors of Grenada county to the chief inspector, as a credit prior to such auditing of its books as may follow, was rightfully refused.

IV.    *Chapter 325 of the Laws of 1924 is not unconstitutional as imposing unequal burdens upon the various*

*counties of the state.*  Shot through the whole act are the words "prorated estimated cost," as applicable to the examination and auditing of the books of institutions, boards of supervisors, and officers.  It would indeed be hard to see how a more uniform and non-discriminating method could be adopted in obtaining the actual cost and revenue sufficient for the work of the Auditing Department.  *State v. Board of Commissioners of Edmunds County,* 156 N. W. 96, is squarely in point.  See also *State, ex rel. Guilbert, Auditor, v. Shumate, Auditor,* 72 Ohio St. 487, 74 N. E. 588.

Under the canons of construction above set out and the holdings of our own court, and those of the supreme court of South Dakota and Ohio, we most earnestly contend that the lower court was in error in dismissing the petition.

By virtue of the fact that the South Dakota case in its entirety covers the case at bar like a blanket, we most respectfully request that the two cases be carefully compared.

*Cowles Horton* and *W. M. Mitchell,* for appellee.

*The right of appellant to the issuance of the writ of mandamus.*  Petitioner was not entitled to the writ of mandamus because there existed a full, speedy and plain remedy at law, either by an appeal from the action of the board in refusing to allow the money, or by suit for same in the court having jurisdiction thereof, both of which remedies were open to the chief inspector, or the state.  The law not only gave the right to appeal or to sue, but made this a preference case, triable at the first term, and in preference to other cases, etc., so that he had a *speedy* remedy; and hence was not entitled to resort to the extraordinary writ of mandamus.  This is well settled by a long line of authorities.  *Pearl River Co. v. Lacy Lumber Co.,* 128 Miss. 885, 91 So. 572; *Roberson*

v. *Board of Supervisors,* 105 Miss. 90; *Moreau* v. *Grandich,* 114 Miss. 560; *McHenry* 1. State, 91 Miss. 562.

This is an attempt to control a judicial officer in the exercise of discretionary powers and force him to decide judicial questions in a certain way regardless of his own view of its legality. This our courts have repeatedly held, cannot be done. The writ may be issued to compel some sort of action on the part of such officer, but not to dictate how he shall act, or decide the matter which the law makes it his duty to pass upon. *Robinson* v. *Itawamba Co.,* 105 Miss. 90; *Shotwell* v. *Covington,* 69 Miss. 735; *Monroe Co.* v. *State,* 63 Miss. 135; *State Board of Education* v. *West Point,* 50 Miss. 638; *State* v. *Amos,* 83 So. 393; *Gamble* v. *State,* 54 So. 370; *Board of Supervisors* v. *Simpson Co.,* 89 So. 260.

Counsel for appellant endeavors to meet this overwhelming array of decisions by taking the position that this act makes it compulsory on the part of the board to make this appropriation, it being a ministerial act, leaving it no discretion in the matter, etc., in other words, that they must make the allowance regardless of their opinion as to its justness, legality, or whether or not it was due, etc. But the court will note that this position is contradictory to that taken by him in another part of his brief, wherein he intimates that it would be the duty of the board to determine whether or not the auditing department had collected the forty thousand dollars prescribed by this act.

The fact that the legislature has made a specific appropriation is not conclusive on the officers (even ministerial officers), and they may nevertheless determine the legality or constitutionality of the appropriation. 36 Cyc. 902, and authorities cited.

Counsel cannot get around the fact that the Constitution of the state makes boards of supervisors a part of the judicial system, and clothes them with judicial powers and discretion in matters coming before them, especially as to the making of appropriations.

II. *As to the constitutionality of chapter 325, Laws
of 1924.* The act violates sections 175 and 174 of the
constitution in its provisions authorizing the removal
of officers for failure to carry out the directions of the
department as to the system of accounting, etc., adopted
by it, and that authorizing the collection of the penalty
of ten per cent against defaulting officers, etc., by dis-
trict attorneys, when suit is brought by them. These un-
constitutional provisions are so interwoven and con-
nected that their elimination would amount to a complete
mutilation of, and change in the general scheme. The
elimination of these and other unconstitutional provi-
sions would so emasculate the whole Act as to render it
unenforceable and innocuous. See *Ex Parte Lehman,*
60 Miss. 967, and *Ligon* v. *Pass Christian,* 96 Miss. 640.

Consider also the violation of those sections of the
Constitution dividing the state government into three
distinct departments and prohibiting the exercise of
the functions of one department by officers of another,
and subjecting those in one department to the control
of those in another department, and to depriving judi-
cial officers of their rights and powers.

This act attempts to clothe the chief inspector and the
governor with absolute judicial and legislative powers,
which are very drastic and arbitrary and far-reaching in
their effects—greater powers in fact, than those pos-
sessed by the courts and the legislature, because the
courts cannot try a man, or adjudicate his rights with-
out notice to him and a fair hearing, nor can the legis-
lature provide for the infliction and collection of a pen-
alty by summary process, without judicial decision ad-
judicating the liability. *McBride* v. *State Revenue Agent,*
70 Miss. 716.

It is true as a general proposition that the rules of
construction require that a legislative act be sustained
as constitutional, if it is reasonably possible to do so,
but this rule gives way to another one which requires

that those provisions of the Constitution securing rights of life, liberty, and property of citizens should be liberally construed in favor of these citizens. *Randle* v. *Alabama Coal Co.* (Ala.), 89 So. 790.

The provisions of this act requiring all counties, taxing districts, levee districts, institutions, cities of one thousand population—if brought under the operation thereof, to pay annually the sum of two hundred dollars, as provided in said act—are highly discriminatory and unequal in their application to these various counties, cities, institutions, etc., and are violative of section 112 of the state Constitution, among others, which requires taxation to be *equal and uniform throughout the state.* See *Murray* v. *Lehman,* 61 Miss. 283.

We herein submit that this law differs very radically and fundamentally from those of the states of South Dakota and Ohio, cases from which counsel so confidently relies upon, and which he says are on all fours with this case.

We, therefore, insist that the cases cited are not in point here. On the contrary, they tend to sustain the contention of appellees that these auditing laws must conform to the provisions of the state Constitution requiring taxation to be equal and uniform throughout the state, and if they fail to do this they are unconstitutional and void.

The statement of the rule, as laid down by Mr. Cooley and supported by this court in *Ballard* v. *Oil Co.,* 81 Miss. 507, is that it is only where the constitutional and the unconstitutional can be separated "so that each may be read by itself" that the constitutional provisions can stand.

This very same principle was likewise referred to and applied in *Adams* v. *Standard Oil Company,* 97 Miss. 880, and seems to be the universal rule with regard to constitutional construction of statutes. See 6 R. C. L. 121.

Argued orally by *Harry M. Bryan,* Assistant Attorney-General, for the state and *Cowles Horton* and *W. M. Mitchell,* for appellee.

ETHRIDGE, J., delivered the opinion of the court.

On July 3, 1924, the state auditor, as chief inspector, under chapter 325 of the Laws of 1924, entitled "An act to provide for the inspection, supervision, and auditing of public offices, and to establish a uniform system of public accounting and auditing," addressed a letter to the board of supervisors of Grenada county, making a demand for the payment of two hundred dollars authorized by section 2 of said chapter. The board of supervisors refused to issue the warrant so requested, and on the 26th day of November, 1924, the attorney-general filed a petition for mandamus to compel the board to issue such warrant.

In said petition it was stated that George D. Riley is the duly elected, qualified, and acting state auditor of public accounts, and has been since January 21, 1924; that as such he is *ex officio* chief inspector and supervisor of public offices and public institutions, and under chapter 325, of the Laws of 1924, is charged with enforcement of the provisions of the said act.

It is further alleged that the act aforesaid went into effect on July 1, 1924, and the said chief inspector proceeded to organize his department for the purpose of inspecting and auditing the various public institutions, boards of supervisors, levee boards, etc; that said branch of the auditing department immediately upon its organization began to function and has functioned, to perform the duties required of it by law.

It is alleged that under section 2 of the act said auditor had given notice to, and made demand for payment by, the defendants of two hundred dollars; that the defendants had received such notice, and the time of receipt thereof was more than forty days next before

filing petition; but that the defendants have wholly failed to make the allowance as required by the law; that the petitioner has no other full, adequate, or complete remedy to compel the compliance with the law except by mandamus, and prays for writ to issue returnable at the January, 1925, term of the circuit court of Grenada county, and for the direction of the issuance of such warrant as required by law.

The petition was demurred to:

First, upon the ground that the two hundred dollars sought to be collected from Grenada county under the provisions of chapter 325 of the Laws of 1924 was not due, because section 3 of the act provided the system so created should not go into force until the first of October.

Second, that the petitioner failed to allege that the two hundred dollars demanded of Grenada county was necessary to make up the total amount of forty thousand dollars provided for by said Act of 1924, chapter 325, as the maximum sum to be collected by the department from the said offices, institutions, and counties named in the bill.

Third, because the petitioner has a plain, adequate, and speedy remedy at law, either by an appeal from the order of the board, or by suit in the court having jurisdiction in the matter.

Fourth, that the petitioner seeks by mandamus to compel the performance of a judicial act and to control the discretion of the board in the performance of a judicial duty.

Fifth, that the said chapter 325, Laws of 1924, is unconstitutional and void, because it attempts to confer judicial and legislative powers upon executive officers, contrary to sections 1 and 2 of the state Constitution.

Sixth, that said act is unconstitutional because it is an appropriation act but fails to fix the maximum amount authorized to be withdrawn from the treasury under its provisions, and engrafts other legislation upon an appro-

priation bill, contrary to sections 63 and 69 of the Constitution.

Seventh, that said act is unconstitutional and void because it is contrary to section 175 of the Constitution, providing how public officers shall be removed from office.

Eighth, that said act is unconstitutional and void because it attempts to deprive judicial officers of this state of their constitutional and statutory prerogatives and powers, and to subject them to control of another department of government.

Ninth, that said act is unconstitutional and void because it deprives the board of supervisors of the right to pass upon the justness or legality of any claim for costs of any audit the chief inspector may determine is necessary, but makes it mandatory on the board to pay such claims as may be demanded of it if approved by the Governor of the state, without any right of appeal therefrom.

Tenth, that the act is unconstitutional and void, because it attempts to confer the right upon district attorneys to collect fees in violation of section 174 of the Constitution.

Eleventh, that said act is unconstitutional and void because it attempts to take away the personal liberty and property rights of the citizens of the state without due process of law.

Twelfth, that the act is unconstitutional and void, in that it is unequal and discriminatory in its provisions as between the various counties, cities, and public institutions, etc.

Thirteenth, that the act is unconstitutional and void because it deprives the board of supervisors of the right to cause an audit to be made of the books of any county officer without the consent of the chief inspector, and deprives them of the right to fix the cost of any such audits or to determine the necessity of making same.

The demurrer was sustained by the circuit court, the attorney-general declined to plead further, and final judgment was entered dismissing the petition, from which this appeal is prosecuted.

Chapter 325 is a lengthy act, but we will summarize its chief features:

By section 1 the auditor of public accounts is made chief inspector and supervisor of public offices and public institutions, and it provides that he has the power to appoint certain assistants and fix their compensation, to judge of the qualifications of such assistants, equip their office, etc.

By section 2 every board of supervisors, each levee board, every public institution in the state, owned in whole or in part by the state, or supported in whole or in part by the state, including the several colleges, state penitentiary, hospitals, and asylums, shall, upon written notice from the chief inspector, pay to said chief inspector the sum of two hundred dollars not later than forty days after receipt of said notice, provided that the total amount of such fund collected for any one year shall not exceed forty thousand dollars, and imposing damages at the rate of two per cent of the amount of said sum for each month or part of a month of delay and failure; and it provides that the said sum shall be paid by the chief inspector to the state treasurer for the credit of the auditing department fund, and provides that the chief inspector shall give a receipt made in duplicate, one to be delivered by him to the state treasurer for all moneys received by him, and he shall take a receipt from the state treasurer in duplicate, one to be delivered by him for all moneys delivered to the treasurer. All amounts paid by the said board of supervisors and by the said levee boards and institutions as aforesaid shall be placed on the books of the said chief inspector to the credit of the said board of supervisors, and they, and

each of them, shall be entitled to a credit for the said principal sum of two hundred dollars so paid for the services rendered under this act to the said respective boards of supervisors, levee boards, and public institutions. It is also provided that, upon completion of the work required by this act for any state office, public institution, boards of supervisors, county officer, or levee board, the said chief inspector shall render to the state officer, board of supervisors, levee board, or public institution liable for such costs an itemized statement thereof as soon after the same was incurred as practicable, and that the costs and expenses of the work and services under the provisions of this act so rendered by the said chief inspector shall be the actual estimated prorated cost thereof under the operation of this act, but the said chief inspector shall be the judge of the cost thereof and in the event of a disagreement between him and the board of supervisors, public institution, or levee board, the matter shall be left to the Governor, and the decision of the Governor shall control and be final.

It is further provided that all fees and amounts collected for services under the provisions of this act shall be paid within forty days after the notice of the said itemized statement thereof; that all expenses and costs of inspecting and auditing the allowances and expenditures of boards of supervisors, and all expenses of examining and auditing the county offices, shall be paid on the said prorated estimated costs thereof, by the boards of supervisors of the respective counties, and all of the expenses relating to the auditing and inspecting under the provisions of this act shall be paid by the respective institutions upon the completion of the work in said institutions out of the general support fund of such institution, and the estimated costs and expenses of auditing and examining the state offices shall be paid out of the amounts allowed to the said chief inspector in his capacity as state auditor, and paid to the credit of the said fund as hereinbefore stated, but the said state audi-

tor shall pay into the treasury any and all other amounts collected by him and allowed to him as commissions and fees under the law not required for the auditing and inspecting of the said state offices.

It is further provided that the cost of any examination made necessary by the willful fault of any officer of the state or of the county or levee board, including the members of the boards of supervisors and all employees of the state, of the county, and of the public institutions of the state, shall be recovered by the chief inspector from such person in any court having jurisdiction thereof, and in addition thereto the chief inspector shall recover interest and damage in the sum of ten per cent., which said ten per cent. shall be allowed to the attorney, if any, that the chief inspector may employ, and no part of the said ten per cent. shall be retained by the chief inspector, but no suits shall be filed or attorney employed by the said chief inspector until written notice to such officer or employee shall be given for thirty days to pay the said costs, as provided in the act; that the costs of any service or act performed by the chief inspector under the provisions of this act as to any county, county officer, county employee, or county institution shall be paid by the board of supervisors of the county, the cost thereof as to any levee district shall be paid by such levee district, and the cost thereof as to any municipal corporation if brought under the provisions of the act, shall be paid by the authorities thereof, and the cost thereof as to any public institution, including university, college, hospital, or asylum, shall be paid by the authorities thereof out of the general support fund of such institution, but no *per diem* compensation shall be allowed the chief inspector or his assistants for their service under the provisions of the act, and the chief inspector shall receive no salary in addition to his compensation allowed by law as state auditor; that the chief inspector shall render to the tribunal liable for such costs an itemized statement thereof as soon after the same is incurred as

practicable, and it shall be the duty of such tribunal or authority to allow the same and cause the same to be paid as aforesaid; that the moneys received by the chief inspector shall be deposited by him as aforesaid with the state treasurer to the account of the auditing department fund.

Section 3 provides that the chief inspector shall formulate, prescribe, and install a system of accounting and reporting in conformity with the provisions of the act, which shall be uniform for all state offices, uniform for all county offices, uniform for all boards of supervisors, all levee districts, all public institutions, for all municipalities, and for all public accounts of the same class. It prescribes a general outline of what such accounts shall show, and provides that the system so formulated shall not go into effect until October 1, 1924, when the terms of said inspectors and clerks begin, but, in the meantime, the chief inspector, and the assistant chief inspector, who shall be appointed when this act takes effect, shall formulate and prescribe the system of accounting and auditing herein provided for. It further provides that unexpended balances or appropriations of any institution, etc., shall remain to the credit of the fund for which they were appropriated or levied, and shall not be expended for any purpose except that for which they were appropriated or levied. The chief inspector shall require from every taxing body, public institution, levee board, state officer, county officer, board of supervisors, financial reports covering the full period of each fiscal year, in accordance with the forms and methods provided for in the act.

It is further provided that it shall be the duty of every public officer, including every officer of the state, every officer of a county, every officer of a levee district, every officer of a public institution, and of all employees as aforesaid, to keep all accounts of his office, board, or institution in the form prescribed by the chief inspector, and to make all reports required by the chief inspector

under the provisions of the act. It is then provided that
—"Refusal or neglect to perform these duties shall sub-
ject the person offending to removal from office, and in
addition thereto, he shall be guilty of a misdemeanor and
shall on conviction be punished by fine not to exceed five
hundred dollars or imprisonment in the county jail not
to exceed six months, or both."

It is then provided that the chief inspector shall have
power by himself or by any of his assistants to examine
into all of the financial affairs of every state office, of
every county office, of every board of supervisors, of
every levee board, and of every public institution, main-
tained in whole or in part by the state, or any county,
as aforesaid, and to examine fully into all of the finan-
cial affairs of every public office, public institution, of
every levee district, including all of the financial affairs
of the board of supervisors, and shall make such an ex-
amination at least every four years, and, if necessary,
once every year.

It is further provided that the chief inspector or any
of his assistants shall have power and may exercise all
of the authority to issue subpœna and compulsory proc-
ess, and to direct the service thereof by any sheriff or
constable, to compel the attendance of witnesses and the
production of books and papers before him at any des-
ignated time or place, and administer oaths, and, for
any failure to attend or testify, witnesses may be fined
by him for contempt, and he may invoke the process of
the chancery court to compel such testimony and likewise
the production of all papers, books, or other documents
or other evidence in his opinion requisite, and orders
therefor may be had either in term time or in vacation
upon two days' notice to the opposite party, and, if any
person shall refuse to appear before the said chief in-
spector or any of his assistants when required to do so,
or shall refuse to testify in regard to any matter or re-
fuse to produce any books or papers in his possession,

or under his control, or that should be in his possession or under his control, in addition to being liable for contempt, he shall be guilty of a misdemeanor, and upon conviction thereof shall be fined not more than five hundred dollars or imprisoned not more than six months, or both. Willful false swearing in such examination shall be perjury, and shall be punishable as such.

It is further provided that a report of each examination shall be made in duplicate—one to be filed in the office of the chief inspector, one in the accounting department of the office, officer, board, institution, or body examined, and, if it appear from such a report that any amount be due the county, state, institution, or other body by any officer or employee, or any liability by any member of the board of supervisors for allowances illegally or unlawfully made, or for any allowances or expenditures made without authority of law, there shall be recovered said amounts and interest at the rate of six per cent. per annum from the date that such amounts are shown to be due, and the said chief inspector shall make written demand for said amounts upon the officer or employee or other person liable for the payment thereof, and, if the said officer or employee or other person upon whom such demand is made shall pay the amount demanded or due within thirty days from the giving of such written demand, he shall only be liable for interest thereon at the rate of six per cent. per annum as aforesaid; that the chief inspector shall not have the right to employ any attorney or deputy to recover any of said amounts until the expiration of thirty days, nor shall he have the right to pay any attorney any fees for collection of said amounts or any part thereof if paid by such officer, employee, or person within said thirty days, and, if such amounts are paid by such officer, employee, or other person, with interest within thirty days, the chief inspector, in his capacity as state auditor, shall not be entitled to any commissions or fees for collection. After

the expiration of thirty days from the said written de-
mand, the chief inspector, in his capacity as state audi-
tor, shall have the right to institute the necessary pro-
ceedings and to prosecute the same in any of the courts
of the state to a final conclusion, and he shall have the
right to employ attorneys to assist him in such proceed-
ings. In the event attorneys are employed, there shall
be recovered, in addition to the interest thereon at the
rate of six per cent. per annum, damages in the sum of
ten per cent. on the amount collected, none of which shall
be retained by the chief inspector, and all of which ten
per cent. damages shall be paid to the attorneys.

It is further provided that, instead of employing at-
torneys to assist him to recover any amounts due or for
any illegal allowances or expenditures or amounts due
as aforesaid, the chief inspector may deliver a certified
copy of the said report to the attorney-general for such
action as may be proper in the premises, and he may,
in addition to said report to the attorney-general file a
copy of the said report with the district attorney for all
examinations of any board of supervisors, county officer,
employee, member of the levee board, or of a member
of any board of supervisors coming within the jurisdic-
tion of said district attorney, and, in the event of any
suit by the attorney-general or district attorney to re-
cover any amounts shown to be due the county, state,
institution, or other body, there shall be recovered in-
terest as aforesaid and damages in the sum of ten per
cent. which said ten per cent. damages shall be paid to
the proper body or party. The chief inspector, in his
capacity as state auditor, shall not be entitled to any com-
mission or fees for the collection of any amounts dis-
closed by any examination or service made under the
provisions of this act, or by any of the inspectors here-
under, whether the collections were made by him, or by
any attorneys or deputies that he may employ in his ca-
pacity as state auditor, or whether the said collections

were made by the said attorney-general or a district attorney as aforesaid.

It is then provided that the chief inspector may extend the provisions of this act at any time, in his discretion with the written approval of the Governor, or when and as directed in writing by the Governor, to any municipality in the state of Mississippi having more than one thousand inhabitants.

By the provisions of the last section, the act is to take effect and be in force from and after July 1, 1924.

In our opinion, the writ of mandamus was the proper remedy. The board of supervisors were not given discretion to pass upon the question as to whether the demand should be paid or not. Their duty in the premises was ministerial and not judicial.

By the express provisions of the act, the act went into effect on July 1, 1924, and it was the duty of the auditor to appoint his chief assistant and to formulate the system of accounting provided for in the act.

By section 3 of the act it is provided that the system so formulated was not to go into effect until the 1st of October, and that certain employees should not begin their duties until that time. Nevertheless it was the duty of the auditor to collect the funds for the purpose of conducting the department, and his demand upon the board of supervisors was not premature, and it was the duty of the board of supervisors to make the allowance within forty days as provided for in the act, and, as they did. not do so, but under the allegations of the petition, refused to do so, the writ of mandamus was a proper remedy to compel them to act. The mandamus was for the purpose of enforcing a ministerial duty and not a judicial duty. Appeals by the board of supervisors are only allowed from judicial decisions and are not allowed from a mere refusal to perform a ministerial duty. Where they have no discretion, mandamus may be used to compel them to perform an act.

141 Miss.—46.

This brings us to a consideration of the constitutionality of the act. All of the boards, officers, and institutions affected by the act are public institutions, offices, and boards, and it is public rights that are to be exercised, directed, and controlled by the act.

In 7 R. C. L., p. 926, under the heading "Legislative Authority and Control," it is stated: "Since a county while a body corporate is a subdivision of the state, created for administrative and other public purposes, and owes its creation to the state, it is a rule that it is subject at all times to legislative control and change."

By section 33 of the state Constitution "the legislative authority of the state shall be vested in a legislature." The delegation is in general terms, and carries all of the legislative power that is not withheld by specific provisions of the Constitution, or which is not limited and restricted by either the state or federal Constitution.

Boards of supervisors are provided for in section 170 of the state Constitution, which reads as follows:

"Each county shall be divided into five districts. A resident freeholder of each district shall be selected, in the manner prescribed by law, and the five so chosen shall constitute the board of supervisors of the county, a majority of whom may transact business. The board of supervisors shall have full jurisdiction over roads, ferries, and bridges, to be exercised in accordance with such regulations as the legislature may prescribe, and perform such other duties as may be required by law. The clerk of the chancery court of each county shall be clerk of the board of supervisors."

It will be seen from a reading of this section that the Constitution gives the board of supervisors full jurisdiction over roads, ferries, and bridges, to be exercised in accordance with such regulations as the legislature may prescribe, and shall perform such other duties as may be required by law. The right of the legislature to

control them under proper regulations as to their consti-
tutional jurisdiction is provided for in the Constitution
itself.   Their other powers and duties are such as the
legislature may confer, or prescribe not violative of the
Constitution.

In 15 C. J., p. 420, section 53, it is said: "As counties
are but subdivisions of the state, created by the legisla-
ture for political and civil purposes as agencies of the
state government, they are entirely subject to legislative
control, except so far as restricted by the Constitution
of the state.   The legislature need not submit an act re-
lating to county affairs to the voters of the county for
approval, unless required by constitutional provision;
but, where it is optional with a county to be bound or not
by a legislative act, it cannot assume to be bound by a
part of the act, without at once being liable to the re-
maining provisions."

In *Jackson County* v. *Neville,* 131 Miss. 599, 95 So. 626,
the court upheld the power of the legislature authorizing
the Governor to appoint an auditor to audit county books,
being Laws 1914, chapter 241 (Hemingway's Code, sec-
tion 4783), which act provided for the auditing of the
books of the county by an agency of the state, and ap-
pointing the Governor and circuit judge as persons to
pass upon the correctness, etc., of the audit so made,
and providing for the payment thereof out of the treas-
ury of the county.   This court held that the revenues of
the county are not its property in the same sense as
revenues of private person or corporation, but are sub-
ject to the control of the legislature, and that, when the
legislature directs county funds to be applied to a par-
ticular purpose, that obligation is imposed upon the
county.   This case will dispose of a good many of the
contentions made in the argument.

In *Abbott* v. *State,* 106 Miss. 340, 63 So. 667, it was
held that the Laws of 1908, chapter 106, section 3, pro-
viding that the live stock sanitary board shall have ple-

724　Knox, Atty. Gen., v. Board of Sup'rs. [Sup. Ct.

Opinion of the Court.　[141 Miss.

nary power to deal with all contagious and infectious diseases of animals and to make, promulgate, and enforce such rules and regulations as in the judgment of the board may be necessary to control, eradicate, and prevent the introduction and spread of tick fever, etc., and to provide penalties for violations of such rules and regulations thereafter to be adopted, is not invalid as a delegation of legislative functions. At page 351 of the Mississippi Reports, 63 So. 669, the court in its opinion said:

"It seems clear that the legislature may confer upon the live stock board the power to make rules and regulations to prevent the introduction and spread of contagious or infectious diseases of live stock, and in the same act provide penalties for violations of such rules and regulations thereafter to be adopted. In such legislation it is the legislature that makes a violation of the rules and regulations a crime, and not the live stock board that makes the violation thereof a crime. Much authority may be found to the effect that legislation of this character is not a delegation of legislative functions, but we believe it unnecessary to collate the authorities here."

In *Hancock County* v. *Shaw,* 120 Miss. 48, 81 So. 647, it was held that section 1, chapter 38, Laws of 1917 (Ex. Sess.), requiring counties to pay owners of cattle killed or injured since March 1, 1916, in dipping under the supervision of county agents, is not invalid, as being retrospective and as impairing vested rights of individuals or private corporations in violation of Constitution 1890, section 16, prohibiting *ex post facto* laws; the legislature having the right to compel a state subdivision to discharge an obligation considered a just claim against the public. The court held that the statute creates no right of action against an individual or private corporation, but simply gives a right of action against the county

Sept., 1925] Knox, Atty. Gen., v. Board of Sup'rs.    725

141 Miss.]                    Opinion of the Court.

whose agent destroys or permanently injures private property.

In *Cox* v. *Wallace,* 100 Miss. 525, 56 So. 461, it was held that the Code of 1906, sections 371 to 391, relating to the creation of drainage districts, is not in violation of the Constitution of 1890, as an invalid delegation of legislative power, on the ground that the statute does not itself create the district, but leaves the determination of the question under specified conditions to the determination of the board of supervisors. There is a similar holding in *Jones* v. *Belzoni Drainage District,* 102 Miss. 796, 59 So. 921. It was therefore permissible for the legislature to provide for the details of the system of auditing to be prescibed as it was done in the act under review. The general plans and purposes of the system are provided in the statute, and it is permissible to intrust an officer or board with formulating mere details of the system. Whether the law be a wise one or not is a question with which the court has no kind of concern.

"The wisdom or necessity of laws for the establishment of drainage districts are matters for determination by the legislature, with which the courts have no concern." *Cox* v. *Wallace, supra.*

"The legislature must decide what laws are necessary within the police power, and it is not for the court to decide whether a law is needed or advisable in the general government of the people." *State* v. *J. J. Newman Lbr. Co.,* 102 Miss. 802, 59 So. 923, 45 L. R. A. (N. S.) 851; *Darnell* v. *Johnson,* 109 Miss. 570, 68 So. 780; *State* v. *Senatobia Blank Book & Stationery Co.,* 115 Miss. 254, 76 So. 258, Ann. Cas. 1918B, 953; *Heidelberg* v. *Batson,* 119 Miss. 510, 81 So. 225.

In *Board of Trustees of University of Mississippi* v. *W. P. Waugh,* 105 Miss. 623, 62 So. 827, L. R. A. 1915D, 588, Ann. Cas. 1916E, 522, an attack was made upon the power of the legislature to prohibit the existence of Greek letter fraternities at the state University, and the

court held that as the University was an educational institution owned by the state, and operated by it for purposes of educating the youth of the land, that the legislature had the right to create, regulate, or abolish them, and that the courts cannot supervise the wisdom of disciplinary regulations by the legislature.

These decisions and text-books show that the legislature has the right to control the counties, their property and funds, unless specially restricted by some constitutional prohibition, regulation, or limitation.

We will take up the several specific contentions by the appellee in support of the ruling of the court below which held the act to be unconstitutional:

It is said, first, that the act violates section 175, because it authorizes the removal of officers contrary to that section of the Constitution. Section 6 of the act simply provides that refusal or neglect to perform the duties required by the act shall subject the person found guilty to removal from office, and in addition thereto be subject to conviction for a misdemeanor. The act does not say that the auditor or his assistants may remove such officer, and is silent as to how the removal shall be made. Refusal to comply with the act is made a misdemeanor, and removal is a part of the penalty for violating the act, and subjects the officer to removal from office. This act must be considered in connection with section 175 and the construction thereon placed by the court. So construed, it means that the officer, violating the act by refusal to perform the duties required of him, may be indicted therefor by a grand jury, and on conviction may be removed from office. The act does not violate section 175. It is also provided that the employees to assist the auditor may be removed from office. These are not officers in a constitutional sense, if indeed they are officers in any sense. They are mere deputies or assistants, and it is competent for the legislature to provide for their removal under the doctrine announced in *State* v. *Christmas,* 126 Miss. 358, 88 So. 881.

It is said that the act violates section 174 which provides for a district attorney, and provides, "And whose compensation shall be a fixed salary." In section 7 of the act (chapter 325) it is provided:

". . . And in the event of a suit by any district attorney to recover any of said amounts, there shall be recovered interest as aforesaid and ten per cent. damages, as aforesaid, and any and all amounts collected by the said attorney general or district attorney shall be paid to the proper body or authority. The chief inspector in his capacity as state auditor shall not be entitled to any commission or fees for the collection of any amounts disclosed by any examination or service made under the provisions of this act, or by any of the inspectors hereunder whether the collections were made by him, or by any attorneys or deputies that he may employ in his capacity as state auditor, or whether the said collections were made by the said attorney-general or a district attorney as aforesaid."

The act in terms has provided for a compensation for the attorney-general and private attorneys. It does not expressly provide that the ten per cent. shall be paid to the district attorney in the event he brings the suit. If it had so provided, it would not void the act, but would only go to the particular provision to pay the district attorney fees prohibited to him, and that might never arise, because presumably a district attorney would not accept compensation prohibited by the Constitution. It would not affect the general operation of the statute, but would be entirely a severable provision.

It is next insisted that the act is unconstitutional because of conflict with sections 1 and 2 of the Constitution, providing for the three separate departments of government, and prohibiting the officers of each department from exercising the powers of another department. The authorities already cited cover this contention.

It is next insisted that the act violates section 112 of the state Constitution, providing for the equality and uni-

formity of taxation. This section simply provides that taxation shall be uniform and equal throughout the state. Property shall be taxed in proportion to its value. Property shall be assessed for taxes under general laws, and by uniform rules, according to its true value. But the legislature may provide for a special mode of valuation and assessment of certain property. But all such property shall be assessed at its true value, and no county shall be denied the right to levy county and special taxes upon such assessment as in other cases of property situated in the county and authorizes the legislature to impose a *per capita* tax upon such domestic animals as by their nature and habits are destructive of other property.

The act in question, chapter 325, does not provide anything at all in reference to the assessment and levying of taxes. It does not deal with the raising of revenue. It is not provided how revenue shall be raised; it simply provides for the payment by the board of supervisors out of the county treasury in cases applicable to counties, of the expenses named in the act not to exceed two hundred dollars. All funds that go into the county treasury are not raised by taxation. Fines in enforcing the criminal law constitute a part of the county funds. The act does not deal with how the funds shall be procured. The funds are to be procured as funds for other purposes. When it comes to paying out the county funds after they are collected, the section would certainly not apply. A bridge built in one part of a county might cost a great deal more than a bridge built in another part of the county. A contract for one link of road might be let at a higher rate than the contract for the same work in another part of the county. The section has no application at all. The funds of a county are raised for various purposes. A given amount may be levied for one purpose, another amount for another purpose. The same is true of state institutions and offices. Money is

to be taken out of the treasury. No tax is directed to be levied at all. Whatever taxes are levied for the purpose of raising the general revenue are assessed and levied under the provision of the Constitution. But the state has privilege taxes and other classes of taxes not controlled by section 112. So it is difficult to see how section 112 can even remotely apply.

It is also insisted that the act is unconstitutional because it is an appropriation act, and fails to fix the maximum amount authorized to be withdrawn from the treasury under its provisions, and ingrafts other legislation upon the appropriation bill, contrary to sections 63 and 69 of the state Constitution. The act plainly fixes the maximum amount to be paid if it was considered an appropriation bill. Each county is required to pay two hundred dollars maximum, and the total amount is fixed at forty thousand dollars to be paid in any one year. This would be a sufficient compliance with the law if it was an appropriation bill.

In our opinion it is not an appropriation bill within the sense of these sections of the Constitution. It is an act providing for the creating of an auditing system in the state, and the expenses are to be based upon the services required to be rendered in carrying out the system. There are numerous acts of the legislature authorizing counties to pay out moneys for certain purposes, but they do not generally fix the amount that may be paid out as a sum total. The sections of the Constitution referred to, have reference to appropriations by the legislature, and the expenses provided for in this act come out of appropriations already made by the legislature to various offices and institutions of the state. An appropriation bill is different from an act providing for the uses and disbursements of moneys by the officers of institutions to which the appropriations are made by the legislature.

If systems of the kind here involved are evils, or if they destroy local government in the counties and mu-

nicipalities, that is a question to be settled at the ballot boxes between the people and the legislature. Whether the law is needed or not, or whether it is wise or not, cannot be settled here. Our functions are to decide whether the legislature had the power to act in passing the law and not whether it ought to have acted in the manner it did. The court will uphold the Constitution in the fullness of its protection, but it will not and cannot rightfully control the discretion of the legislature within the field assigned to it by the Constitution.

Practically all of the powers and duties provided for in this act have been provided for in other departments concerning the business confided to such department, not the same powers or duties, but similar legislative action applied to different conditions and circumstances. The legislature ought to be the best judge of the needs for a law. Its thought and attention is directed to that end. The court's thought is not and ought not to be directed to legislative problems, but is and ought to be confined to construing the law and applying it to litigable controversies that arise out of law applied to business activities of the country. There may be some of the details, such as that conferring power to fine for contempt and subpœnaing persons to appear before the auditing officers, that are unconstitutional, but these are not now properly before the court; they do not affect the general features of the act, and, if they are void, would not destroy the remainder of the act.

It follows that the court below erred in declaring the law unconstitutional, and the judgment will be reversed, and the cause remanded for further proceedings.

*Reversed and remanded.*

SMITH, C. J. (specially concurring).

I concur in the main in the views set forth in the opinion in chief, but not altogether with what is therein said with reference to section 112 of the Constitution. If the

statute had provided that the expense of the auditing department created by it should be paid from a fund raised by collecting from each of the counties the sum of two hundred dollars, irrespective of the assessed value of the property therein, a very serious question in my judgment under this section of the Constitution would have been thereby raised, but the statute does not so provide. The two hundred dollars to be collected from each of the counties and state institutions is simply an advance payment by the counties and state institutions on the debt to be thereafter incurred by each of them for the auditing of its books as provided by the statute.

ANDERSON, J. (dissenting).

Section 112 of the Constitution provides among other things, that "taxation shall be uniform and equal throughout the state." Chapter 325, Laws of 1924, sets up a new branch of the state government. It provides a bureau for auditing the accounts of public officers and for the establishment of a uniform system of public accounting and auditing. The statute makes it the duty of this bureau to audit the books and accounts of every state institution, state officer, levee board, and all county officers, and, if it choose to do so, all municipal officers in municipalities of more than one thousand inhabitants. And the statute does the unusual thing of conferring the power on this bureau to raise by taxation the necessary funds to pay the salaries of its officers and employees and the expenses incurred in performing their duties. In my judgment the method provided for the raising of these funds violates the equality and uniformity clause of section 112.

Section 2 of the act authorizes this state auditing bureau to levy against each county, municipality, state officer, state institution, and levee board under its supervision an arbitrary sum of two hundred dollars, provided the amount collected in any one year shall not ex-

ceed forty thousand dollars.  The levy against the counties is to be paid by county taxation, and the levy against state officers and state institutions is to come from state funds raised by state taxation on all the taxpayers of the state.  It is true that the statute provides that credits shall be given to the counties, municipalities, state offices, state institutions, and levee boards for the amounts so paid.  But none of it ever goes back to its source.  As best I can gather from the act, this fund is a support fund for the bureau.  It is to pay salaries of officers and employees so far as it will go.

Section 2 of the act then provides that, in addition to this assessment of two hundred dollars, each county, municipality, state officer, state institution, and levee board shall pay the actual expenses of examining and auditing their books and records.  To use the language of the statute, each shall pay "the actual estimated pro-rated cost" fixed by the chief inspector of the bureau who "shall be the judge of the cost thereof, and in the event of a disagreement between him and the board of supervisors, public institution or levee board, the matter shall be left to the Governor and the decision of the Governor shall control and be final."

Now what does this power to levy mean?  It is true in name it is not a levy against the taxpayers of the county.  On the face of it, it is just a levy against the county as a municipal corporation.  But, in considering this question, the courts must look through the form to the substance.  The counties have no funds except what they raise by taxation.  These levies by this auditing bureau can be met alone by the levy of a county tax.  The amounts demanded of each county would have to go into the county budget just like any other expenses and charges against the county.  There would have to be an increase in county taxation to meet the requirements of the bureau.  A certain rate of taxation would have to be levied by the boards of supervisors for that purpose,

which would either have to be done specifically or added to the rate levied for general county purposes. Regardless, however, of how it might be raised, the taxpayers of each county would be burdened with an additional tax in one form or another. Would the tax be uniform and equal throughout the state? There is no pretense in the statute of fixing the amount each county should pay according to the assessed value of the property therein. Each county, without any regard whatever to the assessed value of its property, is required to pay a fixed amount, whenever called upon by the bureau, of two hundred dollars, provided the amount from the whole state shall not exceed a certain maximum, and in addition to these levies of a flat sum there is prorated to each county which they must pay the actual estimated cost of the work done by this bureau in each county. The result is that Washington county, with perhaps a real and personal assessment of fifteen million dollars would be taxed no more than Itawamba county with a real and personal assessment of probably three million dollars or four million dollars. The rate therefore would be one thing in one county and another thing in another. For illustration, it would probably be five times as much in Itawamba county as it would be in Washington county. There is no escape from the proposition that this bureau under the statute has got to be supported and financed by the taxpayers of the state. It makes no difference whether the charge is levied directly against the taxpayers or indirectly. The bureau under the statute levies it against the counties, and in turn the counties of course levy against their taxpayers. If there ever was as example of inequality and lack of uniformity in taxation, it looks like this is one.

In *Murray* v. *Lehman,* 61 Miss. 283, the court passed on the constitutionality of a statute providing for the payment of a docket fee in all cases in the circuit and chancery courts of Warren county for the purpose of

supplementing the salaries of the judges and chancellors of that county. At that time Warren county constituted a separate circuit and chancery court district. It was contended, and the court held in that case, that the statute violated the equality and uniformity provision of our Constitution. The reasoning in that case, it seems to me, is determinative of the question here involved. The opinion in part is in this language:

"The Constitution declares that 'taxation shall be equal and uniform throughout the state.' From this fundamental rule it is fairly deducible that 'a tax cannot be imposed exclusively on any subdivision of the state to pay an indebtedness or claim which is not peculiarly the debt of such subdivision, or to raise money for any purpose not peculiarly for the benefit of such subdivision.' *Sanborn* v. *Commissioners,* 9 Minn. 273 (Gil. 258).

"The docket fee required by the act under consideration is a tax, and while imposed in only a given county is devoted to a state purpose, viz.: The payment of the salaries of the judge and chancellor of that district. It is true that this tax is not on property, but on court proceedings, yet the fact remains that it is an invidious local discrimination confined to particular courts, and not applicable to the counties and courts of the state generally. It violates the rule of equality and uniformity prescribed for the whole state by the Constitution, by imposing on those having the expense of proceedings in the courts in Warren county an additional burden to compensate the judge and chancellor, when persons similarly situated elsewhere are not thus taxed. It prescribes a different rule for different localities, without a difference in the situation and circumstances of the localities, and, because of the difference of place requires what is not required for exactly the same thing in other localities. It is for the legislature to select the subjects of taxation, but to impose on suitors and all interested in proceed-

ings in courts in one county the expense of maintaining
courts not peculiar to it, and the expense of which else-
where is a charge on the state treasury, is to depart from
the constitutional rule of equality and uniformity in
taxation throughout the state.    The rule requires that
persons in the same class and property and rights of the
same kind shall generally be subjected alike to the same
common burden.    There must not be local exactions,
except for peculiar local advantage.    There cannot be a
higher tax on property in Warren county for state pur-
poses than in other counties, nor can those bearing the
expense of proceedings in the courts in that county be
compelled to contribute to pay for what is a state pur-
pose what is not exacted from persons similarly situated
elsewhere.    It is an unfair discrimination between sub-
divisions of the state, which are entitled to equal rights
and upon equal terms as to all the tribunals created by
the Constitution for all the counties.    If the purpose for
which the exaction is made was peculiarly local it might
be justifiable, but this is not its character.    The scheme
is to impose on persons having proceedings in the courts
in Warren county the burden of making compensation
for the services of the circuit judge and chancllor of the
state, who is charged with the duty of holding the courts
in that county.    It is a discriminating imposition in a
particular county for a general purpose common to the
state.    Those on whom the docket fees fall are made to
contribute to a state object in a mode not required of
any except those concerned in proceedings in a particu-
lar county.    It is of the essence of all taxation that it
should compel the discharge of the burden by those on
whom it properly rests.    The expense of maintaining
judges and chancellor, according to the plan adopted,
rests on the state and not on suitors.    There is no ex-
emption of persons or property in Warren county from
taxation for raising money for the state treasury, out of
which the salaries of judges and chancellors in other

districts are paid, but persons and property in that county are taxed as in other counties for all state purposes. So that, while persons and property in Warren county contribute their full proportion to the revenue of the state, the proceedings in the circuit and chancery courts held in that county are placed under contribution for the support of the state courts held there. The appellant is a citizen of Warren county, possessed of taxable property there, and is therefore a contributor, by taxation for state purposes, to the treasury, out of which are paid, for their services, circuit judges and chancellors for other districts, and yet he is denied access to the circuit court in the county of his residence, except upon terms not applicable in other counties to maintain courts in which he is a contributor. He is taxed to maintain courts throughout the state, and taxed on his suit to maintain them in Warren county, and may be taxed on property or business to pay the salaries of the judge and chancellor in that county, for if the docket fees and license fees are not sufficient, the required amount is to be raised by county taxation.''

If this new branch of the state government can stand up and function under section 112 of our Constitution, that would mean that the legislature could authorize each and every branch of the state government to raise its support fund in like manner. For illustration, the legislature could authorize the judiciary of the state to organize and assess the counties in the state without regard to assessed value for sufficient funds to pay their salaries. The trustees of the state colleges could be authorized to raise their support fund in the same manner. The state board of education could be authorized to raise the enormous sum required for the support of our public schools in the same manner, and so on with every other branch of the state government. This is a state tax provided by this statute. It is not a county tax. It is raised to support a branch of the state government in the per-

formance of its duties. It is true some of the duties of the bureau, as do some of the other branches of the state government, pertain to the affairs of the counties and municipalities. That, however, does not prevent it from being a state agency and the tax a state tax. In other words, it is a tax to carry out a state policy. One of the main purposes of the statute is the auditing of state officers, state institutions, and levee boards. The flat levies against the counties of two hundred dollars provides the support fund of the bureau while so engaged, as well as while engaged in auditing the affairs of the counties and municipalities.

And if the statute does bear the construction put upon it by the majority of the court, still section 112 of the Constitution condemns it. The majority opinion proceeds on the idea that, if the entire salaries and expenses of administering the bureau are apportioned among the counties according to the services rendered each, the equality and uniformity provision of the Constitution is not violated, because each county is paying for the benefit it gets, notwithstanding there may result a different rate of taxation among the counties; in other words, that it is competent for the legislature in raising state funds to fix the rate of taxation in each county according to the benefits received by it from the expenditure of such funds. Applying that principle the result is the rate of levy may be different in every county in the state. In raising state funds, the Constitution requires a fixed levy or an appropriation of funds that must result in a fixed levy uniform throughout the state, and of course applying to the property of every county in the state. The state cannot raise funds for a branch of the state government from the different counties in the state according to the benefits that each county has received. If that be true, the legislature could require of Lowndes county a larger rate of state taxes than many other counties in the state, on account of the benefits that

141 Miss.—47.

county is supposed to receive because of the Woman's College being there. Like requirement could be made of Lafayette county on account of the University being located there, and in fact every county in the state where some state institution is located, supposed to carry with it local benefits. When it comes to state taxation and state benefits arising therefrom, the state is a political unit, and is not divided up into eighty-two political units —the number of counties in it. When the books and records of a county are audited by this bureau under this statute, the state is acting for the entire state and not for that county alone. When the books and records of Leflore couny have been audited, the state has done no more for that county than it has when it has audited the books and records of Itawamba county, although in doing the work it took ten times as long to do that in Leflore as it did in Itawamba. Each county has had its records audited, and that service is just as complete and valuable to a small county as to a big county, even though it takes a great deal longer to do the work in one than in the other. We are dealing with state benefits in dealing with this auditing bureau. The only way a state *ad valorem* tax can be raised is either by a direct levy by the state of a fixed rate in every county in the state or making an appropriation from the county treasuries requiring such a levy by the counties. Every property owner of the state, for illustration, whose assessment is ten thousand dollars, regardless of what county the property may be located in, must pay exactly to the fraction of a cent the same amount of taxes. The levy must be the same millage against each.

The entire plan and fundamentals of the statute, so far as its revenue features are concerned, are not only violative of section 112 of the Constitution, but it seems to me are violative of the very spirit of our form of government.

The revenue feature of the statute is not separable from the balance of it. It is the prop of the whole structure. Therefore, if that goes down, the whole goes. McGowen, J., concurs in these views.