# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 2000-CA-00759-SCT

*AMY TUCK, LIEUTENANT GOVERNOR,*

*STATE OF MISSISSIPPI*

*v.*

*SENATORS BARBARA BLACKMON, ROBERT JOHNSON, JOHN HORHN, WILLIE SIMMONS, JOHNNIE WALLS, DAVID JORDAN AND SAMPSON JACKSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/01/2000 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: T. HUNT COLE, JR. |
| ATTORNEY FOR APPELLEES: | TRENT WALKER |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED- 03/08/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/29/2001 |

**EN BANC.**

**PITTMAN, CHIEF JUSTICE, FOR THE COURT:**

¶1. This matter comes to the Court on appeal from an order of the Chancery Court of the First Judicial District of Hinds County wherein the chancellor declared that Lieutenant Governor Amy Tuck, in failing to order the reading in full of a conference report presented to the Mississippi Senate during the 2000 legislative session, upon the demand of a member of the Senate, violated Article 4, Section 59 of the Mississippi Constitution. The powers of government in our state, as in our nation, are vested in the citizens. Through our Constitution, certain of these powers are distributed by the citizens among three separate branches of government under a tripartite constitutional structure which grants to each branch broad but nevertheless limited and often exclusive powers beyond the scope of each of the other branches. Today we hold as we have held throughout our history that only after heightened consideration and under exigent circumstances will judicial authority to regulate the internal actions of the Legislature be exercised. Therefore, we reverse the judgment of the chancery court and stay the hand of the court in attempting to regulate the legislative process.

## STATEMENT OF THE CASE

¶2. During the closing days of the 2000 legislative session, the Senate was considering conference committee reports when Senator Barbara Blackmon rose on a point of order and asked that "whatever that is going to be passed into law, whatever is going to pass into the state statute, or whatever the Governor is going to sign, be read in full before final passage." The request was made pursuant to Article 4, Section 59 of the Mississippi Constitution of 1890, and the Lieutenant Governor, then presiding, ruled that the Senator

was not entitled to have House Bill 1609 read because the matter before the Senate was not a bill, but was a conference report, not subject to the requirements of Section 59. Senate Rule 112 allows an appeal from a ruling of the presiding officer to the whole Senate; however, Senator Blackmon and six other senators aggrieved by the ruling chose not to seek such redress, but rather filed their complaint in the chancery court seeking injunctive relief to compel the enforcement of Section 59 as they understood it.

¶3. On Sunday afternoon, April 30, 2000, as the 2000 legislative session was drawing to an end, the seven members of the Senate filed in the chancery court a Complaint for Temporary Restraining Order, Writ of Mandamus and Injunctive Relief, seeking judicial action to prevent the Lieutenant Governor in her capacity as President of the Senate from enforcing her ruling denying the request that House Bill 1609 be read in full after it had passed and the conference committee report had been filed. On the following evening, the chancellor entered a temporary restraining order granting the relief sought, apparently with no formal notice to the Lieutenant Governor, and set the matter down for hearing on the merits of the complaint on the following day, May 1, at 1:30 p.m. At the conclusion of that hearing, the chancellor entered her order granting the requested injunction and further declaratory relief which required that, on the request of any Senator, full conference reports must be read immediately before a vote on final passage. The legislative deadline for action on appropriations and revenue bills during that session of the Legislature was 2:00 p.m. of the same day. Appropriation conference reports were required to be passed and filed by 6:00 p.m. and bond conference reports by 12:00 midnight of the same day. In less than forty-eight hours, the proceeding in the chancery court had gone from the filing of the complaint to a final declaratory judgment. At risk were over one hundred appropriation bills and over $170,000,000 in appropriation and bond measures.

¶4. After the chancellor's order was entered, on motion of the Lieutenant Governor, this Court stayed the chancery court's order, and this appeal was filed.

¶5. On appeal, the Lieutenant Governor challenges the chancery court's authority to issue its restraining order and declaratory judgment and the procedures followed in that court.

## ANALYSIS OF THE ISSUES

### I. Separation of Powers

¶6. With respect to the separate powers of each branch of governments, the courts will generally refrain from interfering with the Legislature's interpretation and application of its procedural rules and with its internal operations. In *Dye v. State ex rel. Hale*, 507 So. 2d 332 (Miss. 1987), this Court was presented with a challenge to the delegation of powers by the Senate to the Lieutenant Governor, in his capacity as President of the Senate. In *Dye*, the issue was a fundamental one of the unique position of the Lieutenant Governor as an executive officer with specific legislative duties as President of the Senate, presenting a crucial question of the interplay between the executive and legislative branches. This Court explained its role with regard to the workings of the Legislature in these words:

> Without doubt, we will as a general rule decline adjudication of controversies arising within the Legislative Department of government where those controversies relate solely to the internal affairs of that department. On the other hand, legislators nor the bodies in which they serve are above the law, and in those rare instances where a claim is presented that the actions of a legislative body contravene rights secured by the constitutions of the United States or of this state, it is the responsibility of the judiciary to act, notwithstanding that political considerations may motivate the assertion of the claims

nor that our final judgment may have practical political consequences. Where, as here, it is alleged that one arguably a member of the Executive Department of government is exercising powers properly belonging to the Legislative Department, we are of necessity called upon to decide whether the encroachment exists in fact and, if so, whether it contravenes the mandate of Sections 1 and 2 of our Constitution that the powers of government be separate....

*Id.* at 338-39 (citations omitted). After making clear that it had before it something more than mere rules for internal operations of the Senate, but rather questions basic to the separation of powers among the great branches of government, this Court spoke to its authority to declare Senate rules unconstitutional:

While this Court certainly has the authority to declare Senate rules unconstitutional, the Court should not do so unless those rules are "manifestly" beyond the Senate's constitutional authority. Indeed, the Court has zealously defended its authority to make rules regulating proceedings within the Judicial Department free of any restrictions found in statutes . Considerations of comity militate in favor of this Court's restraint in the face of a challenge to the Senate's similar prerogative to adopt its own rules, absent manifest unconstitutionality of a type not present here.

*Id.* at 345-46 (citations & footnote omitted). An interpretation by the Senate of the extent of its power under the Constitution, while not binding on the courts, should be accepted unless manifestly wrong. ***Witherspoon v. State ex rel. West***, 138 Miss. 310, 326, 103 So. 134, 138-39 (1925), cited with approval in ***Dye***, 507 So.2d at 345.

¶7. Our policy of restraint in venturing into the internal operations of the Legislature as expressed in ***Dye*** is rooted in longstanding recognition of the wisdom of such restraint as expressed in ***Ex parte Wren***, 63 Miss. 512 (1886) and ***Hunt v. Wright***, 70 Miss. 298, 11 So. 608 (1892). In ***Wren***, the appellant who challenged the efficacy of a statute as signed by the Governor, tried to delve into the legislative process, specifically to offer journals to show that amendments had been adopted but dropped from the bill when it was submitted to the Governor. The Court disallowed this saying:

The fundamental error of any view which permits an appeal to the journals to see if the constitution has been observed in the passage by both houses of their enactments, is the assumed right of the judicial department to revise and supervise the legislative as to the manner of its performance of its appointed constitutional functions. It is the admitted province of the courts to judge and declare if an act of the legislature violates the constitution, but this duty of the courts begins with the completed act of the legislature. It does not antedate it. **The legislature is one of the three co-ordinate and co-equal departments into which the powers of government are divided by the constitution, possessing all legislative power and not subject to supervision and control during its performance of its constitutional functions, nor to judicial revision afterward of the manner in which it obeyed the constitution its members are sworn to support. From necessity the judicial department must judge of the conformity of legislative acts to the constitution, but what are legislative acts must be determined by what are authenticated as such according to the constitution.**

That instrument [the constitution] contains many provisions as to the passage of bills which are admitted to be addressed to legislators exclusively, and for non-observance of which there is confessedly no remedy which courts can apply. Why should a distinction be drawn between the different provisions of the constitution, and some be held mandatory and others directory? There is no

reason for such a distinction, and it is the offspring of a necessity born of the error of regarding any of the provisions of the constitution addressed to and obligatory on the legislature as enforceable by the courts as supervisors of the legislature. **The sound view, and that which avoids the inconsistency of the distinction mentioned, is to regard all of the provisions of the constitution as mandatory, and those regulating the legislative department as addressed to and mandatory to that body, and with which the courts have nothing to do in the way of revision of how the legislature has performed its duty in the matters confided exclusively to it by the constitution.**

*Wren*, 63 Miss. at 533-34 (emphasis supplied). In *Hunt*, decided under the Constitution of 1890, the appellant argued that the dramshop and privilege tax chapters of the Code of 1892 were void, saying that they were not constitutionally adopted. This argument was based on several assertions including assertions of violation of the provision of Art. 4, § 68 of the 1890 Constitution mandating that no appropriation or revenue bill shall be passed during the last five days of the session. The Court, relying on *Wren,* held:

> the legislature, as a co-ordinate department of the state government, invested by the constitution with legislative power, is not subject to supervision and revision by the courts as to those rules of procedure prescribed by the constitution for its observance, because, while those rules are all *authoritative* and *mandatory* to legislators, who are sworn to note and observe them, they exhaust themselves upon legislators, and are not for the consideration of courts....

*Hunt*, 70 Miss. at 303-04, 11 So. at 609 (emphasis in original). Thus, *Hunt*, as well as *Wren*, recognizes that procedural provisions for the operation of the Legislature-whether created by constitution, statute or rule adopted by the houses-- should be left to the Legislature to apply and interpret, without judicial review. *See also* ***Barnes v. Ladner***, 241 Miss. 606, 616, 131 So. 2d 458, 461 (1961) ( wherein the Court, relying on *Hunt*, pointed out that Section 65, appearing in that part of the Constitution entitled "Rules of Procedure," Article 4, entitled "Legislative Department," is not for consideration of the courts).

¶8. The rule annunciated in these cases and refined by *Dye* is a statement of the well precedented and respected political question doctrine itself grounded in prudent judicial restraint. To stop the ongoing legislative process while seeking court decisions on the propriety of internal practices will do service to neither branch of government. As demonstrated by these cases, it is a mistake to draw distinctions, for present purposes, between rules adopted by the Senate itself and those which may be found in the Constitution for its management. Section 59 appears in the "Rules of Procedure" of Article 4 of the Constitution, and the rules of the Senate, whether internally generated or found in the Constitution, are addressed to the Senate where they must be interpreted and applied. Only where that body (or in this case, the President of the Senate who is, by its rules, vested with authority to make rulings on points of order) exercises the responsibility in a manifestly wrong manner which does critical harm to the legislative process is judicial intervention justified.

¶9. It is not necessary for the Court today to determine whether conference reports should be read at the request of a senator. Rather, our question is whether the ruling of the Lieutenant Governor was a grossly unreasonable interpretation of Section 59, and, if so, whether the legislative process suffered substantial harm from that ruling. Section 59 declares that "every bill shall be read in full immediately before the vote on its final passage upon the demand of any member." The Lieutenant Governor ruled Section 59 inapplicable to conference reports and here argues that this is so because, as used in the Constitution, bills and

conference reports are distinct.

¶10. Few words are necessary in addressing the question of whether, even if incorrect, the ruling resulted in damage to the legislative process. The senators have argued no such harm. They do not suggest that they or other senators were uninformed as to the text of either the bill or the conference report or that they had not been distributed; nor do they argue that there was confusion or misunderstanding of those texts or their import. Furthermore, as will be explained below, the Senate Rules themselves provide for reading of the final legislation at a later time, but prior to submission to the Governor.

¶11. The Mississippi Constitution of 1817 made no reference to joint conference committees or conference reports. Nevertheless, in 1817, the Legislature adopted Joint Rule 1 allowing the appointment of such committees as appropriate. Miss. Senate Journal 35-39 (1817). After the adoption of the 1890 Constitution, the two houses made use of conference committees and began taking action on conference reports. The Rules of Procedure appearing in Article 4 of the 1890 Constitution recognize conference reports as one of five distinct items upon which either house may act. These are bills, *e.g.*, Miss. Const. art. 4, § 59; amendments to bills by one house when acted upon by the other house, *id.* § 62; reports of committees of conference, *id.* § 62; orders, votes and resolutions of both houses relating to matters not requiring the signature of the governor, *id.* § 60; and measures, *id.* § 71. The rules establish a variety of different procedures applicable to each of the five, recognizing their different characters. The rules address matters such as the style, format and content of a bill, *id.* §§ 59, 67; where bills must be referred, *id.* § 74; amendments to bills, *id.* § 59-60; and the reading of bills, *id.* § 59. Significantly, none of those sections are made applicable to conference reports. They also prescribe practices for recording different types of votes separately and distinctly. Section 55 addresses recording votes on bills, while Section 62 addresses recording votes on conference reports.

¶12. A textual analysis of Section 59 also supports the conclusion that it is not applicable to conference reports. The section reads:

> [b]ills may originate in either house, and be amended or rejected in the other, and every bill shall be read by *its* title on three (3) different days in each house, unless two-thirds (2/3) of the house where the same is pending shall dispense with the rules; and every bill shall be read in full immediately before the vote on *its* final *passage* upon the demand of any member; and every bill, having *passed* both houses, shall be signed by the President of the Senate and the Speaker of the House of Representatives during the legislative session.

Miss. Const. art. 4, § 59 (1890) (emphasis supplied.) The references to "its title" and "its final passage," indicate that references are to a bill's title and passage-not to any other item brought before a house of the Legislature. Furthermore, the the terms "passage" and "passed" are words of art applicable to bills, but not to conference reports which are not passed, but are rather "concurred in," "adopted," or "rejected." *Id.* § 62.

¶13. It is important to a proper understanding of Section 59 and its limited application to bills and not to conference reports to note that the section allows a member of the house to insist on a reading in full "immediately before the vote on its [the bill's] final passage." The adoption of a conference report is not the final passage of the bill which was presented to conference and reported back to the houses. The conference report does not go directly to the Governor for signature. Rather, the house where the bill originated engrosses a final version of the bill based on reconciling the different provisions passed by the

separate houses and the conference report. The bill is then certified and sent to the Joint Committee on Enrolled Bills. *See* Joint Rules of the Senate and the House, Rule 30. The Lieutenant Governor and the Speaker notify their members of the bill's enrollment, and the title to the bill is read. At that time, immediately before final passage, a member may have the bill read in full. *Id.* R. 31

¶14. With this background and understanding of the Rules of Procedure set out in the Constitution and the rules and practices adopted and current in the Senate, the Lieutenant Governor ruled on Senator Blackmon's point of order. It is impossible for us to say that her ruling was arbitrary or manifestly wrong.

## II. Other errors occurred in the Chancery Court Proceedings.

¶15. Lieutenant Governor Tuck also argues that the proceedings in the chancery court were irregular and contrary to law. We agree. Although there are provisions to be found in our statutes and rules for expediting court proceedings as necessary to do justice, each of those shortcuts is in derogation of the general policy of allowing parties an opportunity to prepare and present their cases and is to be administered within strict limits. Between April 29 and May 1, 2000, when the Legislature was concluding its business for the session, the members of the legislative bodies and those presiding faced the greatest demands on their time and attention.[1] Nevertheless, upon receiving the complaint in this action, the chancellor immediately issued a restraining order and set the matter for a hearing on merits for the following day at 1:30 p.m., and by 4:00 p.m. she issued a final declaratory judgment.

¶16. Under Rule 65(b) of the Mississippi Rules of Civil Procedure, a temporary restraining order may be issued without notice, but only if "it clearly appears from specific facts shown by affidavit or verified complaint that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party can be heard" and the applicant's attorney certifies "in writing the efforts, if any, which have been made to give the notice and the reason that notice should not be required." The complaint, although sworn to, merely asserts the violation of Section 59 as a violation of the plaintiffs' right and that they have no other remedies at law, and, in general terms that they will be irreparably injured unless the Lieutenant Governor is restrained from enforcing her rulings. Such a statement is not a clear and specific statement of irreparable injury. Nor does the complaint indicate any efforts to notify the Lieutenant Governor. While it does appear that, at the chancellor's direction, after the complaint was filed, the plaintiffs were directed to send word to the Lieutenant Governor of the proceedings, it is not clear that given the session-ending activities in the Senate she could reasonably be expected to respond quickly enough to present her side effectively.

¶17. In her temporary restraining order, issued at 7:40 p.m. on April 30, the chancellor set the matter for hearing on the merits at 1:30 p.m. the following day. The complaint asked for a writ of mandamus, temporary restraining order and a permanent injunction. The time span did not allow for an answer to the complaint, and upon the conclusion of the May 1 hearing of the merits, the chancellor issued her final order in which she declared that "[t]he Court does not deem it necessary to issue an injunction . . . , but instead will issue a declaratory judgment pursuant to Rule 57 of the Mississippi Rules of Civil Procedure." By this extraordinary action, a judgment was issued interpreting Section 59 contrary to the ruling of the Lieutenant Governor, without regard to M.R.C.P. 4 which requires the issuance of a summons by the clerk and service of process, or M.R.C.P. 12 which allows thirty days for service of an answer, and a timely hearing on the merits. The senators neither sought, nor could the Lieutenant Governor have reasonably expected that such relief would be granted pursuant to a restraining order setting the complaint for "hearing on the merits"

eighteen hours after its issuance. Recognizing that the chancery court under M.R.C.P. 54(c) may grant relief not requested in the complaint, and that Rule 57(a) makes provision for expediting proceedings on declaratory judgment relief, in doing so the chancellor must keep in mind principles of fundamental fairness consistent with the relief granted. Here, if given such an opportunity to present her case in an orderly manner, the Lieutenant Governor might have saved the chancellor from error.

## CONCLUSION

¶18. Our law recognizes the pernicious consequences of unwarranted intrusion by the judiciary into the legislative process, and we will in the absence of compelling justification leave disputes within the deliberative bodies as to their practices and procedures to be decided by those bodies. Here, the aggrieved senators should have followed their own procedures by appealing the ruling to the floor of the Senate for a prompt, efficient and informed decision. The abandonment of normal judicial processes, which the chancellor no doubt thought compelled by the rush of time and pressures of legislative deadlines, only confirms the wisdom of judicial restraint in cases such as this. The judgment of the chancery court is reversed, and judgment is rendered here for the Lieutenant Governor finally dismissing the senators' complaint and this civil action with prejudice.

¶19. **REVERSED AND RENDERED.**

**SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. DIAZ, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION. BANKS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. McRAE, P.J., AND EASLEY, J., NOT PARTICIPATING.**

**DIAZ, JUSTICE, SPECIALLY CONCURRING:**

¶20. Although I agree with the majority's ultimate holding to reverse and render the decision of the chancery court, I cannot join the sweeping language found under Issue I in the majority's opinion abrogating this Court's authority to interpret rules of legislative procedure that infringe upon fundamental constitutional rights.

¶21. The Lieutenant Governor expended a considerable amount of effort in her briefs and through oral argument to prove that the Legislature has the exclusive authority to determine rules of its own proceedings and that this Court is therefore without jurisdiction to address this controversy. Article 4, § 55 of our state Constitution plainly supports the notion that each house may devise internal operating procedures peculiar to its tastes. I agree with the Lieutenant Governor's assessment of the power conferred by § 55. However, I believe that the narrow focus of this argument avoids the larger question: whether this Court has the power to interpret the language of our Constitution when it is called into question. The majority, in support of the Lieutenant Governor, seems to recognize no principled difference in the Legislature's ability to determine rules of procedure and its authority to enforce them when challenged on constitutional grounds. I believe a repudiation of this distinction under the guise of judicial restraint would compel us to cast a blind eye toward alleged violations of fundamental constitutional rights simply because they are framed as internal "procedural matters."

¶22. The judiciary is not in the business of interfering with the internal operating mechanisms of any rule-making body, administrative or legislative. Indeed, deferring to rationally based legislative judgments "is a

paradigm of judicial restraint." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993).

¶23. Further, it is duly noted that often the only check upon our own exercise of power is our own sense of self-restraint. *United States v. Butler,* 297 U.S. 1, 79, 56 S.Ct. 312, 80 L.Ed. 477 (1936) (Stone, J., dissenting).

¶24. These cardinal truths notwithstanding, it is universally accepted that the highest judicial tribunal of a state is the paramount authority for the interpretation of that state's constitution, subject only to the Constitution of the United States. *Highland Farms Dairy v. Agnew,* 300 U.S. 608, 613, 57 S.Ct. 549, 552, 81 L.Ed. 835, 840 (1937) (holding that a judgment by the highest court of a state as to the meaning and effect of its own constitution is decisive and controlling everywhere); *Alexander v. State ex rel. Allain,* 441 So.2d 1329, 1333 (Miss. 1983). Thus, the matter is reduced to a question of whether this Court can act on questions concerning constitutional interpretation when they involve the internal operating procedures of another branch of government. I believe we can.

¶25. For example, we have recognized that a municipal body is vested with final authority for determining whether its procedural requisites have been met except where the procedural deficiencies may be said to have contravened a citizen's due process rights. *Thrash v. Mayor & Comm'rs of the City of Jackson*, 498 So.2d 801, 807 (Miss.1986). Once the due process claim is asserted, this Court must intervene. *Id.* at 807.

¶26. The Lieutenant Governor argues that all matters regarding the Legislature's internal operating procedures should be left to the legislative branch. However, during oral argument, the plaintiff Senators pointed out that the presiding officer of each house will often refuse to rule on certain matters raised by a point of order because they concern constitutional questions. The presiding officer will simply state that "those are constitutional matters and we do not rule on those." Where, then, are the disaffected voices to seek redress if the Legislature refuses to rule on constitutional questions and the judiciary is without jurisdiction to do so?

¶27. Different provisions of our constitution should be read "so that each is given a maximum effect and a meaning in harmony with that of each other." *Van Slyke v. Board of Trustees of State Institutions of Higher Learning*, 613 So. 2d 872, 876 (Miss. 1993) (citing *St. Louis & San Francisco Ry. v. Benton County*, 132 Miss. 325, 330, 96 So. 689, 690 (1923)). Additionally, the Constitution should be read and enforced "in the manner which best fits its language and best serves our state today." *Dye v. State ex rel. Hale,* 507 So.2d 332, 342 (Miss. 1987); *Alexander,* 441 So.2d at 1334, 1339.

¶28. With these standards in mind, it is essential to remember that it is within the power of the judiciary to review a legislative body's rules for constitutionality and to ensure they do not violate individual fundamental rights. *United States v. Smith*, 286 U.S. 6, 33, 52 S.Ct. 475, 478, 76 L.Ed. 954, 958 (1932); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Indeed, language quoted within the majority opinion lends credence to this view. In *Dye*, we said clearly that "[w]hile *this Court certainly has the authority to declare Senate rules unconstitutional*, the Court should not do so unless those rules are 'manifestly' beyond the Senate's constitutional authority." *Dye,* 507 So.2d at 345 (emphasis added). Further, although we generally decline to rule on controversies arising within the Legislative Department of government where those controversies relate solely to the internal affairs of that department, we noted that neither the

legislators nor the bodies in which they serve are above the law, and in those rare instances *where a claim is presented that the actions of a legislative body contravene rights secured by the constitutions of the United States or of this state, it is the responsibility of the judiciary to act,* notwithstanding that political considerations may motivate the assertion of the claims nor that our final judgment may have practical political consequences.

*Id.* at 338-39 (citations omitted)(emphasis added). I believe the above quoted language from *Dye* implicitly overrules the language relied upon by the majority cited from the earlier *Ex parte Wren,* 63 Miss. 512 (1886) and *Hunt v. Wright,* 70 Miss. 298, 11 So. 608 (1892). One must not view this perspective as a failed exercise in judicial restraint, because to do so would be to embrace an imbalance between the judicial and legislative branches inconsistent with the checks and balances principle necessary among co-equal branches of government. *Des Moines Register and Tribune Co. v. Dwyer*, 542 N.W.2d 491, 496 (Iowa 1996).

¶29. While it is the prerogative of the Legislature to devise, interpret, and enforce its own procedural rules, the judiciary cannot sit idly by and allow the Legislature to act in accordance with those procedural rules when they violate constitutionally protected rights. To do so would be tantamount to sanctioning the constitutional violations simply because they are committed within the walls of the state capitol, a structure founded upon the principle of providing equal protection under the law to all citizens.

### BANKS, PRESIDING JUSTICE, DISSENTING:

¶30. I would affirm the declaratory judgment entered by the chancery court that the point of adoption of a conference report is a point of final passage of a bill such that the constitutional prescription that a member has a right to have the bill read applies.

¶31. In its present posture, this case is not about whether the chancery court should interfere with the operation of the Legislature through the grant of injunctive relief. Nor does it involve a declaration that a bill duly passed is unenforceable because of the failure of the Legislature to adhere to one of the prescribed rules of procedure imposed upon it by our Constitution. What is now before this Court is an appeal from a judgment interpreting Article 4, § 59 of our Constitution. In my view, the chancery court had jurisdiction to make that interpretation, and its declaration was correct. Therefore, I respectfully dissent.

I.

¶32. This Court for years has entertained and decided on the merits controversies arising within the Legislative Department's "Rules of Procedure." *See Presley v. Mississippi State Highway Comm'n,* 608 So. 2d 1288 (Miss. 1992)( applying § 61, the prohibition against revival by reference); *State v. Board of Sup'rs,* 141 Miss. 701, 105 So. 541 (1925) (holding that providing for auditing and supervising offices and providing for expenses of auditing system from appropriation already made or funds already available to several institutions and departments, is not appropriation bill within meaning of Const.1890, §§ 63, 69); *Witherspoon v. State*, 138 Miss. 310, 103 So. 134, 46 (1925) (finding that in view of Const. 1890, § 55, providing that each house of Legislature may determine rules of its proceedings and rules adopted by Senate, Senate's confirmation of Governor's appointment to office does not become final until motion that it be reconsidered be disposed of adversely or time therefor has expired without such motion being made); *State v. Jackson,* 119 Miss. 727, 81 So 1 (1919) (deciding that courts do not favor repeals by mere

implication); *State v. Cresswell*, 117 Miss. 795, 78 So. 770 (1918) (holding that to amend a statute there must be specifically mentioned in the amendatory act of the statute to be amended). One can readily see that with regard to the claim that today's case involves a question in "which the judiciary should not become enmeshed, it is much too late to reclaim our virginity." *Dye v. State ex rel. Hale,* 507 So. 2d 332, 339 (Miss. 1987).

¶33. Other jurisdictions, likewise recognize the power of the judiciary to interpret the Constitution with regard to the conduct of the affairs of the Legislature. *See [United States v. Smith](#),* 286 U.S. 6, 52 S.Ct. 475, 76 L.Ed. 954 (1932)(where the Supreme Court unanimously reversed a construction given by the Senate to one of its own rules, stating that "as the construction to be given to the rules affects persons other than members of the Senate, the question presented is of necessity a judicial one."); *Wilson v. United States*, 369 F.2d 198, 200 (D.C. Cir. 1966) (finding that the presumption that the acts of the speaker of the house and public officials were in accordance with applicable statutes may be overcome by a showing that the acts were based on a misinterpretation of statutory law or in violation of prescribed procedures); *Board of Educ. v. City of New York,* 362 N.E.2d 948 (N.Y. 1977) (noting that, while generally courts will not interfere with the internal procedural aspects of the legislative process, judicial review may be undertaken to determine where the Legislature has complied with constitutional prescriptions as to legislative procedures); *Zemprelli v. Scranton,* 519 A.2d 518, 520 ( Pa. Cmwlth. Ct. 1986) (stating that the respective internal rules of the Legislature give way when the critical question of administrative agency life would be required to be acted upon).

¶34. In *Dye*, we were confronted with a controversy regarding the Senate rules. We ruled that we are entrusted with the authority to declare Senate rules unconstitutional so long as we exercised judicial restraint. We did not retreat from our responsibility to act, "notwithstanding that political considerations may motivate the assertion of the claims nor that our final judgment may have practical political consequences. . . ." 507 So. 2d at 338-39.

¶35. Here as, in *Dye*, the litigation deals with the internal workings of the Legislature. Indeed, *Dye* dealt with rules of procedure adopted by the Senate. Here, as in *Dye*, legislators challenged the rule, invoking the Constitution. In *Dye*, the constitutional provision invoked was the doctrine of separation of powers. Here the constitutional provision invoked is more direct and specific. I see no basis for distinguishing between the two with respect to the power of the judiciary to interpret the Constitution. An adverse ruling in *Dye* would have resulted, at a minimum, in a declaration that senate rules violated the Constitution. A ruling here could, and did, result in the same declaration with respect to a senate ruling involving a constitutionally protected right of a senator affecting the senator's ability to represent intelligently his or her constituents.

II.

¶36. The majority is concerned with the fact that the trial court stayed legislative action in progress for a brief period pending resolution of the constitutional question brought to it. To the extent that this is error, it is capable of repetition. It follows that, although the issue is moot, it should be discussed. A larger question, however, is whether the court should, in keeping with the appropriate exercise of judicial restraint, enjoin the Legislature to comply with its interpretation of the Constitution during proceedings. Denying the Court that power combined with a strict application of the enrolled bill doctrine would effectively deny any remedy for a violation of the Constitution. It is my view that one or the other aspect of judicial restraint must give way in the face of this Court's duty to interpret the Constitution.

¶37. I would hold that the enrolled bill doctrine must give way in circumstances where there has been a clear violation of the Constitution. Legislation so passed in violation of a definitive decision of this Court interpreting the Constitution or in violation of unambiguous provisions of that document should be stricken as void. *Presley v. Mississippi State Highway Comm'n,* 608 So. 2d 1288 (Miss. 1992); *Buford v. State,* 146 Miss. 66, 111 So. 850 (1927); *Moore v. Tunica County*, 143 Miss. 821, 107 So. 659 (1926). So holding would, in my view be of sufficient deterrent value to obviate the necessity of considering any coercive relief.

¶38. As a court in our sister state of Pennsylvania has put it,

> [w]hile the Enrolled Bill Doctrine operates as an appropriate means of judicial restraint to avoid intrusion by the judiciary into the prerogatives of a co-equal branch of government, the legitimacy of such abstention is dependent upon the situation presented. The countervailing concern is the judiciary's mandate to insure that government functions within the bounds of constitutional prescription. *The judiciary may not abdicate this responsibility under the guise of its deference to a co-equal branch of government.*
>
> Our Supreme Court has stated that *"while it is appropriate to give due deference to a co-equal branch of government as long as it is functioning within constitutional constraints, it would be a serious dereliction on our part to deliberately ignore a clear constitutional violation."*

*Common Cause/Pa. v. Commonwealth*, 710 A.2d 108, 117 (Pa. Cmwlth. Ct. 1998) (citations omitted) (emphasis supplied), *aff'd per curiam,* 757 A.2d 367 (Pa. 2000).[(2)]

¶39. The Kentucky Supreme Court has observed that "[t]o countenance an artificial rule of law that silences our voices when confronted with violations of our constitution is not acceptable to this Court." *D & W Auto Supply v. Department of Revenue*, 602 S.W.2d 420 (Ky. 1980). As one judge of another court put it, "making laws is the State Legislature's business but protecting the State Constitution is this Court's business. Viewing an enrolled bill and blessing it as being legal is to forsake, oftentimes, truth." *Independent Community Bankers Ass'n of S.D., Inc. v. State ex rel. Meierhenry ,* 346 N.W. 2d. 737, 749 (S.D. 1984) (Henderson, J., dissenting).

¶40. It is obvious then, that the enrolled bill doctrine is by no means universally accepted. It gives way to the imperative that the supreme command of the people, the Constitution, be enforced and not ignored. It falls to the judiciary, first to, interpret the Constitution and, if necessary, to enforce compliance with that interpretation. Where necessary, that enforcement may take the form of declaring as nullities, enactments arrived at in violation of the Constitution. *See, e. g., Presley*; *Buford*; *Moore*. III.

¶41. In this case, we need not trouble ourselves with the remedy. What we have is a declaration of what the Constitution means. The remaining question to be answered is whether the chancery court correctly interpreted § 59. More, precisely, as the majority puts it, whether the Lieutenant Governor was manifestly wrong in reaching the opposite conclusion. It is my view that she was and that the chancellor was right.

¶42. To me, the question boils down to a determination of the point or points of final passage. I use the plural, because it is my view that there are several points of "final passage" for legislation. This is so because with our bicameral legislative system, nothing is finally passed by the Legislature until both houses have agreed with the full proposition. There are intermediate points where the action of either house is potentially

final for that house. When one house passes a bill originating in that house, there is the potential that the other house will agree without an amendment. When that occurs, the originating house has no further opportunity to act. The bill goes to the Governor for signature. Thus, final passage for the originating house occurred when the bill was first adopted in that house.

¶43. When, on the other hand, the second house amends the bill and the originating house is asked to concur, the vote to concur is final passage. Finally, when one house fails to concur in the amendment by the other and conference occurs, a vote on the reconciling conference report is final passage.

¶44. This view is implicit in our Constitution which, in Art. 4, § 55, requires that the "yeas and nays be entered on the journals on the final passage of every bill" and, in Art. 4, § 62, which requires the recordation of the yeas and nays on amendments from the other house and on conference reports.

¶45. This view is also reflected in the Joint Rules of the Senate and House. Rule 18 applies the super majority for revenue bills, required by Art. 4, § 70, to votes on conference reports. Miss. Const. Art. 4, § 70. Rule 27 provides that the same vote required to pass a bill is required to pass a conference report. Rule 26 provides that the failure to adopt a conference report means that the "bill or resolution under consideration shall be lost."

¶46. In well-reasoned opinions, courts in other jurisdictions have held that "final passage" occurs at different stages and that the adoption of conference reports is one of those stages. For example, in *Minnehaha County v. South Dakota State Bd. of Equalization*, 176 N.W. 2d 56 (S.D. 1970), put it as follows:

> Final passage of a bill occurs in either House when it receives the required vote taken by the ayes and nays on roll call following last reading of a bill, for there is nothing further for that House to do relative to it other than transmit it to the other House for its consideration and if that House approves it as passed in the other by the required vote and record, that is, not merely final passage in that branch but 'final passage' of the bill because it has passed both Houses in the same form and there is nothing further for either of them to do to complete it. But in case the House to which it is transmitted amends it and returns it to the House in which it originated, it is clear that concurrence by this House completes the passage of the bill and this act is 'final passage' within the meaning of Art. III, s 18.

176 N.W. 2d at 59-60. *See also* **Cox v. Stults Eagle Drug Co.**, 21 P.2d 914 (Ariz. 1933); **Cohn v. Kingsley**, 49 P. 985 (1897); **Norman v. Kentucky Bd. of Managers**, 20 S.W. 901, 902 (Ky. 1892); **Roane Iron Co. v. Francis,** 172 S.W. 816 (Tenn. 1915); **Ex parte May,** 40 S.W. 2d 811 (Tex. Crim. App. 1931).

¶47. **Norman**, the seminal case from Kentucky, points out a simple truth. "The words 'final passage,' as used in our constitution, mean final passage. They do not mean some passage before the final one, but the last one." 20 S.W. at 902. As the Arizona court put it, final passage means the vote that "completes passage of the measure" and, in its view, this "meaning accords with the usual practice of parliamentary bodies." *Cox*, 21 P. 2d at 916. It cites for that proposition a provision of the Kansas Senate rule: "A vote to concur in House amendments to a senate Bill or a vote to adopt the report of a conference committee shall be considered the final passage of a bill and shall be taken by the yeas an nays and entered on the journal." *Id*.

¶48. These authorities attest to the proposition that our constitutional provision giving a member the right to demand a reading of the bill "immediately before the vote on its final passage" is most logically interpreted to

apply to several points including the point at which a conference report is adopted. This is what and all the chancery court said. Accordingly, I would affirm its judgment.

1. Recognizing the demands on our legislators, our Constitution exempts them from arrest, except as to serious crimes, during legislative sessions. Miss. Const. art. 4, § 48 (1890). We provide for continuance of litigation during legislative sessions if counsel in the case is a member of the Mississippi Legislature. Miss. Code Ann. § 11-1-9 (1991).

2. *See also* Williams, *State Constitutional Limits on Legislative Procedure: Legislative Compliance and Judicial Enforcement*, 48 U. Pitt. L. Rev. 797 (1987), for a review of various approaches to the enrolled bill doctrine in our sister states. The author suggests as a possible solution to the question of "when a court should invalidate a statute on procedural grounds would rest on a distinction between prohibitions in the state constitution as opposed to affirmative requirements. If the legislature has breached specific prohibitions, the act in question would be held unconstitutional. If the legislature merely failed to adhere to affirmative requirements, less drastic remedies could be imposed, such as a prospective ruling pending the legislature's opportunity properly to 'reenact' the statute."