PIERCE, Justice,
dissenting:
That great constitutional and legal questions may become topics of political and even partisan controversy should never be employed by this Court as an excuse to duck its responsibility to adjudicate the legal and constitutional rights of the parties.
Dye v. State ex rel. Hale, 507 So.2d 332, 339 (Miss.1987).
¶ 133. Many issues presented to this Court require complex analysis, not always because the words before us are hard to understand; rather, because we make them so. I find this case simply an analysis of words and a determination of their legal meaning. To be clear, Article 5, Section 124, of the 1890 Mississippi Constitution is neither hard to apply nor difficult to understand.
¶ 134. Section 124 calls to us from 1890 and beckons this Court to read it and apply its meaning — as written. In a real sense, Section 124 is dressed up and ready to go. Sadly, the majority drives by without so much as slowing down. Thus, Section 124 will forever be waiting — its word never judicially determined.
*440 ¶ 135. Though rudimentary, it cannot be too often repeated that the legislative, executive, and judicial departments of this State all owe their existence to the Mississippi Constitution. Miss. Const, art. 1, §§ 1, 2. Their powers are derived from and limited by that instrument. See Griffin v. Mixon, 38 Miss. 424, 438 (1860) (“They can do nothing without its sanction[.]”). One department no more represents the sovereignty of the State than either of the other two. Miss. Const, art. 1, §§ 1, 2. And by duty and necessity, the obligation of determining whether, in specific instances, one of the departments has exceeded the powers granted to it, “devolves” upon the judiciary. Albritton v. City of Winona, 181 Miss. 75, 178 So. 799, 803 (1938). By its decision today, this Court has not only abdicated the judiciary department’s contemplated role under our theory of government, it has effectively amended Section 124 of the 1890 Mississippi Constitution back to Article 5, Section 10 of the 1868 Mississippi Constitution.[108] By the written word, the majority has turned the constitutional clock back to 1868.
¶ 136. Undoubtedly, the power to pardon in this country derives from the people. Whittington v. Stevens, 221 Miss. 598, 603, 73 So.2d 137, 139 (1954). It is an act of the sovereign’s “mercy and grace.” Montgomery v. Cleveland, 134 Miss. 132, 98 So. 111, 114 (1923). The sovereign may vest its exercise in any governmental body it chooses. Id. As well, the sovereign may properly divest its exercise therefrom. Cf. Herrera v. Collins, 506 U.S. 390, 414, 113 S.Ct. 853, 867, 122 L.Ed.2d 203 (1993) (noting that the United States Constitution “does not require the States to enact a clemency mechanism”).
¶ 137. The case of Jamison v. Flanner, 116 Kan. 624, 228 P. 82 (1924), decided by the Supreme Court of Kansas, provides us one of the most elaborate opinions on the subject of pardoning power. Jamison was a habeas corpus action in which the governor of Kansas had commuted S.H. Jamison’s sentence, but the sheriff had refused to release him from jail because notice was not given to the trial judge or county attorney, nor published in the county newspaper, as required by law, then “R.S. 62-2216.” Id. at 83. A lower court rendered judgment granting the writ and discharging Jamison, and the sheriff appealed. Id. The Kansas Supreme Court reversed the judgment with directions to deny the writ. Id. at 99. In reaching its decision, the Kansas Supreme Court conducted an exhaustive examination of this country’s clemency jurisprudence. In construing the Kansas Constitution of 1861, Article 1, Section 7,[109] the Kansas Supreme Court surveyed practically every state constitution, as well as numerous court opinions from various jurisdictions. Id. at 83-99. And it concluded with the following:
We have summarized the constitutional provisions of the several states and the changes made therein and the decisions of the courts thereon, for the reason that they demonstrate, more forcibly than anything we could say, (1) the purpose of the pardoning power of a government, (2) that in our country it is a power inherent in the people, who may place its exercise in any department or official of the government, (3) that its *441 proper use is beneficial, its improper use is detrimental, and (4) that to avoid its improper use the people may restrict and regulate it by constitutional provision or may by their Constitution provide that it may be restricted and regulated from time to time by the Legislature. And this is what was done in our state.
Id. at 99.
¶ 138. I find the Jamison decision very sound. The Kansas Supreme Court had no trepidation in holding that Kansas courts may inquire into whether a pardon granted by that state’s governor had been issued in accordance with the restrictions and regulations provided by Kansas law.[110]
¶ 139. Here, though, we are not asked to decide whether a statute limiting the governor’s pardoning power was complied with. Such a scenario could have developed under the first Mississippi Constitution of 1817, because that Constitution reserved in the Legislature the right to determine how the governor’s pardoning power should be exercised.[111] Now, however, we are asked to determine whether the constitutional strictures set forth by Section 124 in our current Constitution must be complied with.
¶ 140. Even though the majority maintains they must, it nonetheless contends that the inquiry as to whether they were ends with the governor. This, according to the majority, is because the notice requirement is (1) likely “more about” the Governor’s right to receive complete information before issuing a pardon, and/or (2) the publication requirement is a right that “inures to the benefit of the public, in general, and not to any particular private person.”
¶ 141. Respectfully, I find the majority’s reasoning unsound. Neither the 1817, the 1832, nor the 1868 Mississippi Constitution required notice and publication. See supra n. Ill (1817 clemency provision). The 1832 and 1868 provisions pertaining to clemency read identically and provided that:
In all criminal and penal cases, except in those of treason and impeachment, he shall have power to grant reprieves and pardons, and remit fines, and in cases of forfeiture, to stay the collection until the *442 end of the next session of the Legislature, and to remit forfeitures, by and with the consent of the Senate. In cases of treason, he shall have power to grant reprieves, by and with the consent of the Senate, but may respite the sentence until the end of the next session of the Legislature.
See Miss. Const, art. 5, § 10 (1832, 1868). Had the delegates to the 1890 Constitutional Convention intended to make the exercise of the people’s mercy and grace “more about” the governor’s benefit, they simply could have left well enough alone by carrying forward the 1868 provision. Obviously, that was not their intention.
¶ 142. What was their intention? I am confident to say after reading the plain language of Section 124, their intention was to keep in check a power subject to no substantive measure. We know that, since this State’s inception, the governor has been the custodian of the sovereign’s pardon prerogative and is vested with the authority to act as “sole judge of the sufficiency of the facts and of the propriety of granting the pardon, and no other department of the government has any control over [the governor’s] acts or discretion in such matters.” Cleveland, 98 So. at 114. But with that authority comes immense responsibility under our theory of government. As the Jamison Court cogently pointed out, when properly used, the government’s pardoning power is beneficial to the public, but when improperly used, it is detrimental. Jamison, 228 P. at 99. The reason for the notice and publication requirements adopted by the 1890 delegates was in contemplation of the latter. These requirements are intended to operate as a check on the governor’s substantive discretion, by making the exercise thereof transparent to the public.
¶ 143. The majority appears to reason that, because only the public’s rights are at stake, and not any particular person’s, the question of whether the constitutional strictures of Section 124 were met is non-justiciable. If that is the majority’s position, it is an untenable one. If Section 124 did require actual notice to particular persons, would failure to provide notice in that instance make the matter justiciable? Presumably, the governor still would have the autonomy to grant the pardon, irrespective of whatever complaint a particular individual might lodge in opposition to it. So how, exactly, would failure to provide notice in that instance constitute an act subject to judicial review, but not here? The sincere answer is that, based on the majority’s holding today, a future Court would hold the question there nonjusticia-ble as well.
¶ 144. Lastly, Justice Randolph well distinguishes each of the cases relied upon by the majority to reach its holding in this case. I write further to add what another scholarly jurist has discerned with regard to Hunt v. Wright, 70 Miss. 298, 11 So. 608 (1892), as well as Ex parte Wren, 63 Miss. 512 (1886).
¶ 145. In Jeffrey Jackson’s & Mary Miller’s Encyclopedia of Mississippi Law, Judge Leslie H. Southwick construed the case of Tuck v. Blackmon, 798 So.2d 402 (Miss.2001). 8 Judge Leslie Southwick, Encyclopedia of Mississippi Law (Jeffrey Jackson and Mary Miller eds.) § 68:8 (2001). Judge Southwick began by pointing out that the respective parties in Tuck had debated, in their briefs, the significance of Hunt, with one side seeking to have it overruled and the other side emphasizing its “separation of powers aspects.” Id. Judge Southwick then made the following observation with regard to this Court’s opinion in Tuck:
The Supreme Court stepped back from the absolutism of Hunt v. Wright. Instead of being beyond the Court’s au *443 thority, determining the propriety of the legislative decision as to the meaning of its own rules was held to be within the Court’s prerogatives. However, the power to declare the legislative interpretation in error would be sparingly used: An interpretation by the Senate of the extent of its power under the Constitution, while not binding on the courts, should be accepted unless manifestly wrong.
Making the interpretation of rules a matter of cautiously exercised discretion as opposed to being beyond the power of the judiciary is a profound change affecting the understanding of separation of powers.
[[Image here]]
The Court found that Dye changed Hunt v. Wright. “The rule annunciated in [Hunt and Wren ] and refined by Dye is a statement of the well precedented and respected political question doctrine itself grounded in prudent judicial restraint.” The Supreme Court indicated that it no longer recognizes that judicial review is unavailable as to the application of legislative procedural rules that antedate the “parturition” of a statute.
The Court proceeded closely to examine the constitutional provision for oral reading of bills, and reviewed a variety of authorities on the issue. This is effectively an overruling of Hunt, since the court judicially reviews the accuracy of the senate’s interpretation of a constitutional provision that affects action taken prior to completion of a bill. The Court concluded with “[i]t is impossible for us to say that [the lieutenant governor’s] ruling was arbitrary or manifestly wrong.”
Id. (footnotes omitted).
¶ 146. I agree with Judge Southwick’s interpretation of Tuck, particularly after reading Dye, which expressly found the question presented there to be justiciable. See Dye, 507 So.2d at 339. In so finding, the Dye Court, notably, did not refer to either Hunt or Wren. Yet, in the spirit of those two cases, Dye reiterated that “we will as a general rule decline adjudication of controversies ... [that] relate solely to the internal affairs of [the respective] de-partmentfs].” Dye, 507 So.2d at 338. Significantly, the Dye Court immediately thereafter also reminded itself that neither the departments nor the individuals that comprise them “are above the law, and in those rare instances where a claim is presented that the actions” taken by one of those bodies “contravene rights secured by the constitution of the United States or of this [S]tate, it is the responsibility of the judiciary to act....” Id. at 338-39 (citing Immigration and Naturalization Service v. Chadha, 462 U.S. 919, 940-44, 103 S.Ct. 2764, 2778-80, 77 L.Ed.2d 317, 338-40 (1983); Powell v. McCormack, 395 U.S. 486, 516-22, 547-49, 89 S.Ct. 1944, 1977-78, 23 L.Ed.2d 491, 514-17, 531-33 (1969)). Dye added, where “[t]here is a public need that the legal issues tendered be authoritatively resolved[;] [n]ot only do we have the authority to decide [such] questions[,] we have a public responsibility to do so.” Id. at 339 (citing Frazier et al. v. State, 504 So.2d 675, 692-93 (Miss.1987)).
¶ 147. Here, this Court has been asked to resolve, authoritatively, whether the pardons issued by Governor Barbour complied with Section 124’s notice and publication requirements. But rather than decide the question, the majority re-embraces Hunt and Wren and expands their holdings to find the matter nonjusti-ciable. In so doing, the majority has effectively countenanced a view that almost any interpretation the executive or legislative departments may give to the Mississippi Constitution — no matter how er *444 roneous — is now binding on the judiciary. This is a plank I choose not to walk.
¶ 148. I find the constitutional notice and publication requirements of Section 124 to be mandatory. They are meant to ensure transparency in the governor’s exercise of the pardoning power. A pardon issued by the governor when the notice and publications requirements have not been met, is issued without constitutional authority. Thus, the question whether the pardon had been issued in compliance with the constitutional notice and publication requirements is justiciable and may be inquired into by the courts. For these reasons, I respectfully dissent.
WALLER, C.J., AND RANDOLPH, J., JOIN THIS OPINION.

. Mississippi has adopted four Constitutions since it entered the Union in 1817, the first in 1817, and those that followed in 1832, 1868, and 1890.

. This section, which remains unchanged to date, provides that: "The pardoning power shall be vested in the governor, under regulations and restrictions prescribed by law.” Kan. Const, art. 1, § 7.

. My esteemed colleague, Justice Chandler, reads Pope v. Wiggins, 220 Miss. 1, 69 So.2d 913 (1954), out of context-as does the majority for its part. The question presented there was not whether the notice and publication requirements prescribed by Section 124 must be complied with. Rather, it was whether the governor had authority to revoke a prisoner’s conditional pardon without a revocation hearing, even in the face of a statute which affected the power of the courts to grant suspended sentences and to revoke them on a proper showing. Id. at 914-15. The Pope Court found only the first portion of Section 124 pertinent, and made no mention of the notice and publication requirements set forth in the latter portion of Section 124. Id. at 915. The Pope Court spoke to Jamison because the prisoner, Nora (Noah) Pope, had relied on that case in support of his contention that the Legislature can prescribe conditions for the exercise of the governor’s pardoning authority. Id. at 916. Pope correctly found Jamison inapplicable on the question before it, because Section 124 contains no provision authorizing “the Legislature to restrict and regulate the pardoning power of the governor.” Id.

. See Miss. Const, art. 4, § 10 (1817), which provided:
In all criminal and penal cases, except in those of treason and impeachment, he shall have power to grant reprieves and pardons and remit fines and forfeitures, under such rules and regulations as shall be prescribed by law. In cases of treason, he shall have power to grant reprieves and pardons, by and with the advice and consent of the Senate, but may respite the sentence until the end of the next session of the General Assembly.